In the Matter of the Judicial Settlement of the Final Account of Proceedings of WESTCHESTER TITLE AND TRUST COMPANY and Another, as Executors of PETER JUNKERSFELD, Deceased.*

ANNA B. JUNKERSFELD and Others, Objectors, Appellants; WESTCHESTER TITLE AND TRUST COMPANY, Executor, etc., of PETER JUNKERSFELD, Deceased, and Another, Respondents.

Second Department, April 18, 1935.

---

*Revg. 150 Misc. 436.

*Ezra P. Prentice* [*James F. Collins* and *Charles S. Reilley* with him on the brief], for the appellants.

*Joseph A. Mitchell* [*Robert P. Smith* with him on the brief], for the respondent Westchester Title and Trust Company, executor, etc.

HAGARTY, J. Peter Junkersfeld, the testator in this proceeding, died on the 18th day of March, 1930, leaving a last will and testament, which was admitted to probate by the Surrogate's Court of Westchester county on the 12th day of May, 1930, at which time letters testamentary were issued to respondent Westchester Title and Trust Company and to appellant Anna B. Junkersfeld, as executors.

The testator by his will, after making provision for several general and specific bequests, divided the residue of his estate into three parts, one of which he gave absolutely to his widow, appellant Anna B. Junkersfeld, and the remaining two-thirds he made the subject of a trust fund, the income of which he directed to be paid to the widow and his two daughters, Mary Josephine and Florence Rita, during the lifetime of the widow; on the death of the widow, provision was made for a further subdivision of the trust fund to take in the interest of appellant Patrick J. Boyle, as a life beneficiary, the entire trust to terminate eventually by the payment of the trust fund to the daughters in equal shares.

This proceeding was instituted by the widow, the executor-appellant, on the 19th day of June, 1933, for revocation of letters testamentary issued to her coexecutor, the respondent Westchester Title and Trust Company, hereinafter referred to as " the trust company." On the hearing of this petition on the 27th day of June, 1933, the trust company agreed to proceed immediately to file and judicially settle its account as executor, and its account was filed subsequently, on the 8th day of July, 1933, to which account the coexecutor objected, in conjunction with others interested in the estate and who are also appellants here. Although the proceedings were not consolidated pursuant to the Surrogate's Court Act (§ 65), the learned surrogate directed the hearing to proceed on the account and the objection of the appellants, resulting in the decree under review.

It is undisputed that at the time of the testator's death the estate was worth approximately $195,000, against which there was an indebtedness represented by three notes totaling $32,500. At the time of the accounting the value of the estate had depreciated in the sum of $161,306.28, and after payment of funeral and administration expenses the trust company's account shows assets totaling $3,462.94, which it purports to turn over to the appellant coexecutor,

out of which, in some unexplained manner, she is directed to pay commissions to the trust company of $2,434.18, to herself of $2,890.58, costs and disbursements to the trust company of $1,136.75, and to respondent Bank of the Manhattan Company the sum of $3,390.57, which represents the balance still unpaid on the original indebtedness of $32,500. Thus it appears that the estate is hopelessly insolvent. The objections to this accounting may be generally characterized as attributing waste and neglect and mismanagement to the trust company for permitting this sorry turn of affairs to eventuate.

The main effort of the trust company seems to have been to hold intact all of the assets of the estate, instead of liquidating them, and in so doing it went to extraordinary lengths to prevent, even, the sale of the collateral given for the notes above mentioned, to apply thereon in payment. So, in November, 1930, and with the consent of appellants Anna B. Junkersfeld, widow, and Mary Josephine and Florence R. Junkersfeld, daughters, and pursuant to an order made by the surrogate on the 17th day of November, 1930, it took up the notes and collateral therefor by advancing the necessary funds as a loan to the estate, as evidenced by a new note in the sum of $32,500, executed by the widow and itself as executors. That, unfortunately, placed the trust company in the position of acting in a dual and inconsistent capacity with respect to the estate, namely, as its executor and also as its creditor. The contention of the appellants is that, thereafter, it catered to its interest in the latter capacity to the detriment of the estate. At no time did the trust company endeavor to liquidate the estate, but in its capacity as creditor it did appropriate more and more of the assets to itself as collateral. On the 23d day of December, 1931, as executor, it turned over to itself as creditor, in addition to the securities it received as collateral which had been held by the original lenders, fifty shares of Union Electric Light and Power of Illinois six per cent preferred stock, and on the 6th day of May, 1932, it repeated and completed the process by pledging to itself as creditor all the rest of the assets of the estate which had any value. Both of these assignments, it is asserted by appellants and not disputed by the trust company, were accomplished without their knowledge or consent, except in so far as knowledge may be inferred by consent to the surrogate's order of November 17, 1930.

Reason and authority demand that where an executor has been honest in exercising his functions as such, his mistakes of judgment are to be dealt with leniently and, indeed, with indulgence. Hindsight must not be substituted for foresight. Numerous authorities may be cited in support of the proposition that an executor or

trustee is not to be personally penalized for present or past economic conditions. Where he has been confronted with a dilemma involving a decision, in the case of a falling market, to hold securities in the hope or expectation of a rise in values, or to sell at a reduced price, the disposition of the courts, acting in retrospect, has been and is not to deal harshly with him in the event that his judgment has proved wrong. (*Matter of Weston*, 91 N. Y. 502; *Matter of Clark*, 257 id. 132; *Matter of Andrews*, 239 App. Div. 32.)

In the present case, however, even after resolving every issue and inference of fact in favor of the trust company, the conclusion seems inescapable that there was gross negligence in the handling of this estate. The good faith of the trust company may be assumed, even in hypothecating all the securities of the estate in connection with the indebtedness it acquired, by reason of the note, on the theory that good banking practice required it, and it may be assumed that such action was not prompted by motives of personal gain, but in the general endeavor to preserve the securities in accordance with the widow's wishes. So, also, the contention of the trust company that it was the wish of the widow to hold the securities may be upheld, but acquiescence in her desires is no adequate answer to the other beneficiaries under the will.

If this were a case in which the executors had held the securities under the belief that it was the wise and prudent thing to do, engendered and formed after a reasonable investigation and consideration of the circumstances, it might be possible to justify that decision and absolve them, even though they had done so for a period of over three years from the time of issuance of letters in May, 1930, until practically forced to account in July of 1933. But the facts here conclusively show that it was not a question of a decision made and followed as the result of prudent consideration and investigation, but, rather, of inaction and neglect after November, 1930. Up to that time, in the first flurry of enthusiasm, the trust company had performed its duties with diligence. The securities were marshalled, transfer tax proceedings conducted and completed, and notes of the testator taken over in accordance with the advice of the surrogate. At regular meetings, the trust committee of the trust company considered the problems of the estate as they arose, and worked out the necessary solutions. After that time, however, there is nothing in the record to show anything other than silence and inaction. Month by month the value of the assets dwindled. Despite alarming symptoms, there is nothing to show that the trust company made any investigation as to the status of the estate to aid in a determination to sell or to hold the securities. From November, 1930, to the end, no meeting

of the trust committee was held in which the affairs of this estate were considered. Some oral reports of a man in charge of collateral of the bank were rendered to the trust officer, but the nature of these was not shown on the hearing nor were they even noted at the time they were given. They apparently had to do only with the current quotations of the stocks and bonds with respect to the necessity of taking more assets from the estate to cover the indebtedness. The trust company was alive to the diminishing values for that purpose, but obtuse in its duty to determine what should be done from the standpoint of the welfare of the estate. The slender reed on which it relied, alone, apparently, was that the widow did not desire the securities to be sold. Even in that aspect, the trust company did not acquaint her with the fact that the securities were being gradually and entirely devoted to application on account of the indebtedness, and the welfare of the other beneficiaries was entirely ignored.

The contention of the trust company is that the widow is estopped from charging it with negligence, inasmuch as it acted in accordance with her wishes in holding the securities. This contention may be upheld. However, the conclusion that follows is not to relieve the trust company, but to show that the widow, also, was guilty of negligence. There is some claim here by appellants that this coexecutor was a frail lady who was ignorant of business dealings and of the exigencies of the situation, despite her education, her desires to have the securities preserved, and her dealings with securities on her own behalf. However that may be, it does not excuse her failure to meet the obligations which she assumed by qualifying as coexecutor. When she assumed those obligations she undertook to discharge her functions and duties, at least on behalf of the remaining beneficiaries of the estate, to a degree and standard which would conform with that of a reasonably prudent person managing her own financial affairs. (*McCabe* v. *Fowler*, 84 N. Y. 314, 317; *Crabb* v. *Young*, 92 id. 56, 66; *Matter of Hurlbut*, 210 App. Div. 456, 458.) She acquiesced in and indeed advised the holding of the securities. In doing so, upon no adequate basis, she herself was negligent and must assume joint liability with respondent. " If the executor is merely passive and simply does not obstruct the collection or receipt of assets by his associate, he is not liable for the latter's waste, but where he knows and assents to such misapplication, or negligently suffers his coexecutor to receive and waste the estate when he has the means of preventing it by proper care, he becomes liable for a resulting loss." (*Croft* v. *Williams*, 88 N. Y. 384, 388.) Joint negligence results in joint liability. (*Bruen* v. *Gillet*, 115 N. Y. 10, 15.) So, also, is the coexecutor estopped as

a beneficiary from claiming negligence. (*Matter of Kent*, 146 Misc. 155, 161.) Surrogate Foley, in the case last cited, writes: " I find specifically that the two residuary legatees, Virginia Lowrey Pierson and Juliet Tryon Baggallay, not only consented, but requested the retention of this stock with the expectation of taking it over in kind at the completion of administration. They are estopped by their conduct to question the resulting loss either in their status as residuary legatees or as pecuniary legatees. (*Matter of Garvin*, 256 N. Y. 518, modifying 229 App. Div. 803; *Matter of Hall*, 164 N. Y. 196; *Matter of Niles*, 113 id. 547; *Hine* v. *Hine*, 118 App. Div. 585; *Matter of Jarvis*, 110 Misc. 5, 16.) Beneficiaries who direct an executor to hold, in the hope of a rise in value, cannot complain if their expectation is disappointed by a further decline in value. They cannot hold the executor for the loss which they directly compelled."

Estoppel cannot, however, be asserted as against the other appellants. While it is true that the two adopted daughters did execute a consent to hold securities, in September, 1932, after one of them became of age only eight days previously, the damage had already been done and it appears that the value of the securities had declined to the minimum at that time. There was no ratification of previous negligence, nor was there the full and frank disclosure of all the facts which these fiduciaries owed to these young ladies if, indeed, they intended to bind them by all of the acts and conduct of the executors which had gone before. (*Cumberland Coal Co.* v. *Sherman*, 30 Barb. 553, 575; *Adair* v. *Brimmer*, 74 N. Y. 539, 553, 554; *Matter of Long Island L. & T. Co.* [*In re Garretson*], 92 App. Div. 1; affd., without opinion, 179 N. Y. 520; *Matter of MacNeil*, 165 App. Div. 842.)

The executors here must be surcharged. Section 218 of the Surrogate's Court Act provided, during practically all of the period in question and up to the amendment of April 21, 1931, that legacies are not ordinarily payable prior to the expiration of one year from the time of issuance of letters. Since one year was then the customary period for the settlement of an estate, and, further, since there is nothing in this record which would indicate that prudent and diligent management would not have resulted in liquidation and distribution within that time, the measure of the surcharge shall be determined by the value of the securities as of the 12th day of May, 1931.

While, of course, the appellants, and particularly the coexecutor, do not seek an adjudication holding the latter to be jointly liable, the controversy having been submitted and jurisdiction having been obtained, the proceeding is here for determination in all its

aspects as to the matters embraced in the account. (Surr. Ct. Act, § 274.) The appellant coexecutor complains because the decree purports to charge her, although she has not accounted and did not join in the account as filed. By filing objections to the account, she is deemed to have adopted the account as filed except as to the matters to which she objected. The objection raised all material issues. The proceedings might well have been consolidated (Surr. Ct. Act, § 65), and that may be done on remission to the Surrogate's Court.

The proceeding should be remitted to the Surrogate's Court to fix and determine the amount of the surcharge as to both executors. Deducted from the amount of this surcharge shall be a sum which the widow would otherwise have received after payment of legacies and expenses as the beneficiary of one-third of the residuary. The remainder, after payment of the legacies provided in the will, except as stated, shall constitute the trust fund which shall be set up in accordance with testator's wishes. Even though some benefit shall accrue thereby to the widow in the trust fund, that interest is a prospective one and dependent upon the length of her life, and we are of opinion that she is not estopped to that extent from sharing therein. No commissions or costs shall be allowed.

The decree of the Surrogate's Court of Westchester county should be reversed on the law and the facts, without costs, and the proceeding remitted to the Surrogate's Court to proceed in accordance with this opinion.

LAZANSKY, P. J., SCUDDER, TOMPKINS and DAVIS, JJ., concur.

Decree of the Surrogate's Court of Westchester county reversed on the law and the facts, without costs, and proceeding remitted to the Surrogate's Court to proceed in accordance with opinion.