[712 NYS2d 662]

In the Matter of the Estate of FRANCES E. ROWE, Deceased. WILBER NATIONAL BANK, as Trustee of Trusts Created by the Last Will of FRANCES E. ROWE, Deceased, Appellant; NANCY V. R. WOLF et al., Respondents.

Third Department, August 10, 2000

88

**APPEARANCES OF COUNSEL**

*David Wawro,* Oneonta, for appellant.

*Farrell Fritz, P. C.,* Uniondale (*John J. Barnosky* of counsel), for respondents.

**OPINION OF THE COURT**

MERCURE, J. P.

Petitioner was appointed trustee of a charitable lead trust created under the will of Frances E. Rowe, deceased (hereinaf-

ter decedent). The trust was funded solely by 30,000 shares of International Business Machines (hereinafter IBM) common stock, which was trading for approximately $113 per share at the time of decedent's death in April 1989 and approximately $117 per share when the trust was funded in September 1989. Under the terms of the trust instrument, petitioner was required to make annual distributions to qualified charities of 8% of the estate tax value of the trust assets, or $270,300; at the end of 15 years, the balance remaining in the trust, if any, was payable to respondents, who are decedent's nieces, or their issue.

In August 1994, respondents made a demand pursuant to SCPA 2206 that petitioner file an intermediate accounting, claiming that petitioner's failure to diversify the trust assets had resulted in a decline in yield and forced sales of trust principal, thereby threatening the depletion of the trust corpus by the end of the trust term. In December 1994, Surrogate's Court required petitioner to prepare an intermediate accounting for the period from September 8, 1989 to December 31, 1994 (hereinafter the accounting period). Petitioner filed its accounting and then commenced this proceeding for a judicial settlement thereof. Respondents objected to the accounting upon the grounds (among others) that petitioner's failure to diversify the trust was imprudent in that it violated petitioner's own policy requiring diversification, the policy of the Comptroller of Currency, and regulations of the Federal Reserve Bank.

The evidence adduced at the July 1996 trial of the proceeding to settle petitioner's intermediate account showed that petitioner's own written policy required diversification of the trust assets. At the time of the original funding of the trust in 1989, petitioner's Trust Policy Manual provided: "[I]t is the [Trust] Committee's recommendation that where practicable, the Investment staff follow a balanced and diversified approach in the management of those funds. Any trust accounts not conforming to this principle must be brought to the Committee's attention with supporting data as to the reason for these exceptions." The policy became even more specific in 1994, then providing: "[I]t is the Committee's recommendation that the Investment staff adhere to the principles of the 'Prudent Investor' rule by using modern portfolio theory and following a balanced and diversified approach in the management of those funds. Any trust accounts not conforming to these principles must be brought to the Committee's attention with supporting data as to the reason for these exceptions. Exceptions to

diversification may be made when an agency customer or the trust instrument specifically permits, or where large capital gains would be incurred, or when the cost basis of the property has the potential to be written up in the near future." Further, the 1994 policy advised that existing holdings exceeding 10% of a portfolio should be trimmed down over a period of time, supported by several research houses and reviewed annually by petitioner's Trust Committee (hereinafter the Committee).

As for the actual investment activity engaged in by petitioner, the evidence showed that the Committee reviewed the trust in October 1989. Because the value of the stock had dropped from the time the trust was funded, the Committee felt that it would be imprudent to diversify immediately, but gave its approval to a plan of diversifying at a later time when the stock had reached a higher price. In the meantime, petitioner generated some income by selling various call options, and several small sales and in-kind distributions were made of IBM stock in order to fulfill the annual payout requirements. The first move toward diversification came in February 1991, when petitioner sold 5,000 shares of IBM stock at $125 per share and an additional 2,959 shares at $136 per share. As of the close of the accounting period on December 31, 1994, petitioner still held 19,398 shares of IBM stock valued at $74 per share. Over the course of the accounting period, the market value of the trust assets had dropped from $3,521,250 to $1,853,937.

In August 1997, Surrogate's Court rendered its decision that, from the period September 8, 1989 to December 31, 1994, petitioner was negligent, that it had violated its own policy manual and that it should have diversified most of the trust's holdings in IBM in January 1990. Ultimately, Surrogate's Court ordered that petitioner's Letters of Trusteeship be revoked, appointed successor cotrustees, directed petitioner to turn over the trust property to them, ordered petitioner to refund its commissions to the trust and directed that petitioner pay damages of $496,259, together with $133,990 in interest, for a total of $630,249. Petitioner appeals.

■ Initially, we are unpersuaded by petitioner's various challenges to the finding by Surrogate's Court that petitioner acted imprudently in failing to diversify the trust's investments. During petitioner's administration of the trust, New York followed the "prudent person rule" of investment (EPTL former

11-2.2 [a] [1]),* which provided: "A fiduciary holding funds for investment may invest the same in the kinds and classes of securities described in the succeeding subparagraphs, provided that investment is made only in such securities as would be acquired by prudent [persons] of discretion and intelligence in such matters who are seeking a reasonable income and the preservation of their capital." To determine whether the prudent person standard has been violated, the court should engage in " 'a balanced and perceptive analysis of [the trustee's] consideration and action in the light of the history of each individual investment, viewed at the time of its action or its omission to act' " (*Matter of Donner*, 82 NY2d 574, 585, quoting *Matter of Bank of N. Y.*, 35 NY2d 512, 519). All of the facts and circumstances of the case must be examined to determine whether a concentration of a particular stock in an estate's portfolio violates the prudent person standard (*see, Matter of Janes*, 90 NY2d 41, 50). Further, each individual investment decision should be examined in relation to the entire portfolio as an entity (*see, id.*, at 52-53), and a trustee can be found to have been imprudent for losses resulting from negligent inattentiveness, inaction or indifference (*see, Matter of Donner, supra*, at 586).

At trial, the generalized testimony of Herbert Simmerly, who was petitioner's vice-president and trust officer and a supervisor of the trust, Benjamin Nesbitt, petitioner's senior vice-president and senior trust officer, and investment officers Lynda Peet and Erica Decker was directly contradicted by the testimony of respondent's expert, Loren Ross. Significantly, Ross expressed the strong opinion that petitioner had acted imprudently in failing to diversify the trust's assets immediately upon receipt of the IBM stock, in furtherance of its initial goal of creating a diversified portfolio of fixed income oriented assets and equity or growth assets. According to Ross, both the 15-year duration of the trust and the 8% annual payout requirement made the investment in IBM stock particularly inappropriate. First, IBM's dividends of less than $5 per share fell far short of satisfying the "extremely heavy burden" of having to pay out "an unvarying $270,300 a year" to

---

* Current law, the Prudent Investor Act, requires a trustee "to diversify assets unless the trustee reasonably determines that it is in the interests of the beneficiaries not to diversify, taking into account the purposes and terms and provisions of the governing instrument" (EPTL 11-2.3 [b] [3] [C]). The act applies to investments "made or held" by a trustee on or after January 1, 1995 (EPTL 11-2.3 [a]) and therefore does not apply to this proceeding.

charities, thereby requiring that capital be depleted to supplement the shortfall. Second, the extreme volatility and over-all downward trend of IBM stock during this period and the fact that IBM itself was undergoing an "extremely stressful time" made it unsuitable for fulfilling the trust's investment goals. Moreover, Ross stated that petitioner's tactic of waiting for the IBM stock to rise was based on "wishful hoping" and that any hesitancy on the part of petitioner to sell the IBM stock below acquisition costs was a "cosmetic kind of consideration." Finally, Ross testified that the use of call options increased the risk of the portfolio.

In addition to Ross's testimony describing petitioner's decision to delay diversification as unwise and unreasonably risky, the evidence reveals that petitioner failed to follow its own internal protocol during the administration of the trust up to the time of the intermediate accounting, that petitioner failed to conduct more than routine reviews of the IBM stock and that the target prices set for the trust's IBM stock were department-wide positions affecting many accounts, giving no particular consideration to the unique needs of this particular trust (*see, Matter of Janes*, 90 NY2d 41, 54, *supra*). Finally, we note that neither adverse tax consequences nor any provision of the trust instrument restricted petitioner's freedom to sell the IBM stock and diversify the trust's investments. In view of the foregoing, and recognizing that "the trial court's assessment of the credibility and weight to be accorded an expert's testimony in a nonjury trial is entitled to deference by a reviewing court" (*Levy v Braley*, 176 AD2d 1030, 1033; *see, Matter of Stevens*, 252 AD2d 654, 656), we perceive no basis for disturbing the determination of Surrogate's Court that petitioner acted imprudently in retaining the IBM stock.

■ We also reject the contention that the surcharge imposed by Surrogate's Court was improperly calculated because it was based on an unrealized paper loss during an intermediate accounting rather than a final accounting. It is our view that, notwithstanding the 10 years that remained in the trust term, Surrogate's Court did not abuse its discretion in making an award of damages (*see, Matter of Everhart*, 226 AD2d 892, 893). As the IBM stock was readily marketable at the time of the intermediate accounting, the actual amount of the surcharge could be easily ascertained, and it would have been patently illogical to allow petitioner to continue with its negligent management of the trust simply because 10 years remained on the trust term (*cf., Matter of Stumpp*, 153 Misc 92, 104).

■ Finally, we reject petitioner's claim that, in adopting the damage methodology of respondents' witness, Surrogate's Court failed to adhere to the proper standard for determining damages as established by the Court of Appeals in *Matter of Janes* (90 NY2d 41, 55-56, *supra*). In our view, Surrogate's Court did not abuse its discretion in compounding interest (*see, Matter of Janes*, 223 AD2d 20, 35, *affd* 90 NY2d 41, *supra*). Further, we are not persuaded that Surrogate's Court erroneously computed damages by adding compound interest to the value of the stock at the time it should have been sold and then subtracting the value of the stock at the time it was sold or, if unsold, the time of the accounting, rather than computing interest on the difference between the two values. In fact, there appears to be no dispute that the methodology employed here is precisely the same as that utilized by the Surrogate's Court in *Matter of Janes* (90 NY2d 41, 55-56, *supra*) and implicitly affirmed by the Court of Appeals in that case.

Petitioner grounds its argument on the following language employed by the Court of Appeals in *Matter of Janes (supra)*: "[1] In imposing liability upon a fiduciary on the basis of the capital lost, the court should determine the value of the stock on the date it should have been sold, and subtract from that figure the proceeds from the sale of the stock or, if the stock is still retained by the estate, the value of the stock at the time of the accounting * * *. [2] Whether interest is awarded, and at what rate, is a matter within the discretion of the trial court * * *. [3] Dividends and other income attributable to the retained assets should offset any interest awarded" (*id.*, at 55 [citations omitted]).

We agree that the order employed by the Court of Appeals in that case, dealing (1) with the subtraction of the value of the stock when it was sold or at the time of the accounting from the value of the stock on the date that it should have been sold, and then (2) with the discretionary application of interest and (3) the offset of income actually received, gives the perception that interest is to be computed on the difference between the value of the stock on the date that it should have been sold and its value when actually sold or at the time of the accounting. Closer scrutiny, however, leads us to believe that the Court was merely stating its view on three distinct characteristics of the computation process and that its chronology is not controlling. We therefore conclude that the quoted passage by no means compels the interpretation advanced by petitioner.

Petitioner's additional contentions have been considered and found to be unavailing.

PETERS, SPAIN, CARPINELLO and GRAFFEO, JJ., concur.

Ordered that the order is affirmed, with costs.