[712 NYS2d 225]

In the Matter of the Estate of JOHN P. SAXTON, Deceased. MANUFACTURERS AND TRADERS TRUST COMPANY, as Trustee of the Trust Created by the Will of JOHN P. SAXTON, Deceased, Appellant-Respondent; MARY R. CRITTENDEN et al., Respondents-Appellants.

Third Department, August 10, 2000

## APPEARANCES OF COUNSEL

*Hodgson, Russ, Andrews, Woods & Goodyear,* Buffalo (*Gandolfo V. DiBlasi* of *Sullivan & Cromwell* of counsel, New York City), for appellant-respondent.

*Bond, Schoeneck & King,* Syracuse (*Robert Kirchner* of counsel), for respondents-appellants.

*Nixon & Peabody, L. L. P.,* Rochester (*William S. Brandt* of counsel), for New York Banker's Association, *amicus curiae.*

## OPINION OF THE COURT

PETERS, J.

John P. Saxton (hereinafter decedent) died in November 1958, leaving Anna E. Saxton (hereinafter Saxton), his widow, and respondents, his two daughters, as his distributees under his will. Under a residuary trust established therein, Saxton was given income for her life, with authority to the trustee to invade the principal as necessary to provide for her maintenance and support. The remainder of the trust was bequeathed in equal shares to respondents. The will also provided, *inter alia,* for the appointment of Endicott Trust Company (hereinafter petitioner)[1] as the trustee thereunder, with full discretionary authority. No specific mention of any particular investment was made nor was any direction given of any preferred method of investment. The will was admitted to probate in November 1958.

---

1. Manufacturers and Traders Trust Company acquired Endicott in 1992. For the purposes herein, Endicott will be referred to as petitioner throughout.

The trust was created and funded entirely with International Business Machines (IBM) stock held by decedent. According to respondents, they received no communication from petitioner with respect to their financial circumstances or how the trust should be invested. In fact, it is undisputed that the trustee did not diversify the trust in any manner, thus prompting bank examiners in 1959 to advise petitioner that it could be liable for such failure. Amos Glann, attorney for the estate of decedent, reiterated the bank examiners' instruction and advised, *inter alia*, that waivers and indemnification agreements were needed from both Saxton and respondents to insulate petitioner against liability. By that time, petitioner was already aware that approval by the beneficiaries of continued retention could require reaffirmation and that the burden of revocation should not rest upon them.

In August 1960, respondents received, without explanation, an "Investment Direction Agreement" (hereinafter IDA) which acknowledged that the corpus of the trust consisted entirely of IBM stock, that it was both their desire and that of Saxton to have "the Trustee continue to hold the said [IBM] stock in the Trust rather than to follow the normal banking procedure of diversification," and that both Saxton and the remainder persons "agree to hold the bank harmless in the event that the principal assets of the Trust should decrease in value by reason of particularly, but not limited, a decrease in value of said stock." Finally, it provided that the instrument could be revoked with 30 days' written notice by the beneficiaries.

Testimony revealed that the beneficiaries never requested the IDA, had no input in its preparation nor had any communication with petitioner as to the benefits of diversification or the risks associated with such concentration. Respondents contend that Saxton desired them to sign the IDA and that Glann merely represented the interests of Saxton as executor of the estate. While respondents executed the document, petitioner, as the trustee, did not. At the time the estate was settled in January 1962, it contained 1,575 shares of IBM common stock valued at $569,853.50.

For approximately 19 years, petitioner maintained no regular communication with respondents; it never provided them with annual statements nor advice concerning the trust. In 1980, upon respondent Mary Rita Crittenden's specific and continued requests, copies of the annual statements were regularly provided. Notwithstanding the hiring of a new trust officer, William Nesbitt, in 1979 and his subsequent hiring of

an investment officer, Janet Wilkins, the substance and frequency of contact remained the same.

In 1984, Nesbitt first met Saxton, now in her 80's, and respondents. All parties testified that it was an introductory meeting and that shortly thereafter Crittenden raised the issue of diversification. Respondents began arranging periodic meetings to discuss the trust when Crittenden was in town.[2] By all accounts, respondents would question Nesbitt on the concentration of IBM stock in the trust, voicing concern about its safety and its value. Crittenden testified that Nesbitt maintained that as long as petitioner would still recommend IBM on its "buy" list and the trust was generating income, it should not be diversified. In 1986, when the value of the stock portfolio was over $7,000,000, the beneficiaries urged Nesbitt to prepare a diversification plan. At such time, Nesbitt never mentioned the IDA nor indicated that anything would prevent diversification. No plans were prepared or presented; petitioner never analyzed the risk inherent in keeping the trust 100% concentrated in IBM stock and never compared the performance of IBM to a diversified portfolio comprised of other stocks listed on the bank's "buy" list. Nesbitt conceded that he was aware that effective January 1, 1987, the tax rate on capital gains was scheduled to increase by 40% and that neither the tax change nor its impact on the trust was reviewed with the beneficiaries.

As of April 1987, petitioner's written investment policies recognized that the "prudent person rule" required it to seek a preservation of capital, diversification and a reasonable rate of return on trust investments. Its policies specifically recognized that there existed "several large accounts where we are asked to hold IBM stock, exonerated from holding these stocks as original investments, and yet we have the power to sell them should circumstances dictate." It advised to carefully scrutinize these accounts, specifically noting the Saxton trust.

Crittenden testified that by July 1987 she "reached a point of extreme concern about IBM," felt that "it really wasn't that

---

2. During one of the earlier meetings, respondents discussed the excessive balance in Saxton's non-interest-bearing checking account. As the income generated by the trust greatly exceeded Saxton's needs, they questioned petitioner's practice of simply depositing the excess from $250,000 a year in income from the trust into her checking account to the point where the amount therein exceeded FDIC limits.

safe" and that it was "truly * * * time to diversify."[3] Communication of her concern to Nesbitt via Wilkins precipitated a meeting on July 22, 1987. Testimony from Eugene Peckman, attorney for Saxton and respondents with respect to the trust, confirmed that he was aware of such meeting. Nesbitt again reassured Crittenden that IBM was an outstanding company, that it was still on the bank's "buy" list and that it was doing a very good job of generating income. At that point, the issue of capital gains was raised and Nesbitt advised that if they diversified now they would have to pay a lot of capital gains taxes. Crittenden said that the IDA was mentioned for the first time at that meeting yet Nesbitt assured them that this would not be an obstacle to a sale of stock.

The next day, Nesbitt wrote respondents stating that he understood that they still wanted to hold IBM as the main investment in the trust and requested that they sign a copy of his letter if they agreed with its contents. He further stated that "if the indicators, including [the "buy"] list, would change, then we would want to recommend sales; and probably at some future date * * * should start a diversification program." He thereafter included a tabulation detailing the tax consequences for the sale of different blocks of IBM stock, and recounted that "we discussed the fact that 30 days' written notice to revoke the 1960 agreement will in no way restrict our actions if the sale should become timely." Neither respondent signed the letter. Peckman reiterated his clients' concerns when he wrote to Nesbitt the following day. Nesbitt thereafter acknowledged his duty of diversification, yet expressed that the decision to hold IBM "is not based on [his] recommendation, but rather on a mutual understanding between the parties involved." Copies of this letter were sent to respondents. Crittenden thereafter responded to Nesbitt, informing him that there was "one crucial omission":

"You may remember that we recommended that your experts in trust management be directed to develop a diversification plan for the assets of the Trust. This plan should take into account the value of the stock, the economic condition of the market, tax considerations, and other issues that these experts may regard as important. I and my family count on you to exercise prudent judgment and guide us in understanding these complex factors. As a layman, I believe it is unwise to wait for a 'sell' recommendation from your central office

---

3. Crittenden assumed the role of spokesperson for respondents.

because the stock probably would plummet after, if not before, that recommendation.

"Because the July 23 letter did not mention my recommendation to put the machinery in motion immediately to develop a reasonable plan, I could not sign it. We would certainly be adverse to haphazard sale of IBM, without a well thought out plan. However, at this point, we believe that we do need one so that we do not act on the basis of financial or other crises, but have a carefully conceived choice of alternatives. My sister and I have discussed these issues in detail and are in agreement. I know that Mother is deeply concerned about the safety of the Trust, as well."

Nesbitt neither responded to Crittenden's letter nor prepared a plan for diversification.

Notwithstanding petitioner's own written investment policy, Nesbitt maintained that unless there was a unanimous written revocation of the IDA, he was justified in relying upon the document. Peckman testified that he had numerous other conversations with Nesbitt in July 1987 through August 1987 with respect to the Saxton trust and reiterated that his clients "wanted to have or discuss diversification." With Nesbitt maintaining that they could not do so unless the IDA was revoked, Peckman countered that by law, "the bank had a non-delegable duty to invest the trust fund and to consider the proper method of investing [including] the * * * diversification of the trust fund."

Upon a general market decline in October 1987, the trust lost $4,000,000. In November 1987, Crittenden wrote to Nesbitt and again requested a meeting. She further expressed her concern about the lost value and the fact that he had failed to respond to their requests on July 22, 1987, reiterated in her letter of August 7, 1987. Nesbitt thereafter confirmed a date for their meeting and indicated, by letter, that Wilkins would present "several alternatives for the investment and diversification of your mother's trust." Despite the fact that petitioner's normal policy was to hold no more than 10% of any one stock in a trust, when they met in November 1987, Nesbitt still recommended holding the IBM stock and did not present any plans for diversification. Instead, he prepared two tax tabulations, identical to previous ones. Wilkins conceded that the tabulations were unresponsive to the beneficiaries' request yet were all that were authorized by Nesbitt. After Nesbitt strongly advocated for the trust to remain status quo, Crittenden noted that in view of the current market they would remain with his conservative plan.

Respondents met with Nesbitt approximately twice a year until his retirement in 1990. Linda Hamlin, who assumed his position, failed to communicate or meet with respondents until November 1991, at which time she merely advised them to keep holding the IBM stock. Hamlin later discussed that she lacked experience with trust banking or investment and was originally hired to increase trust business.

IBM declined gradually from a high of $139.50 in February 1991 to $99.50 in June 1991. Testimony revealed that despite petitioner's analysts admitting their discomfort with IBM and belief that there could be a major decline in value, no communication was made with respondents. Hamlin testified that although she met with beneficiaries of other trusts and recommended that they sell their IBM stock, she never prepared a diversification plan for respondents, never provided them with investment advice and was unconcerned about losses to their account.

Petitioner performed a formal portfolio review of the trust in November 1992 and concluded that a diversification plan should be implemented. In March 1993, at a meeting attended by respondents, their children, Hamlin and a representative of petitioner, respondents were given information with respect to a balanced portfolio yet no diversification plan was prepared or presented. Days thereafter, Saxton died and the trust ended. Petitioner distributed the stock and the trust corpus to respondents in July 1993. When petitioner filed its final accounting in November 1993, the value of the IBM stock was $2,986,617.50.

Respondents filed objections alleging, *inter alia*, a breach of petitioner's fiduciary duty by failing to diversify the trust's corpus and exercise reasonable prudence in its management. Respondents further sought to surcharge petitioner, deprive it of its commissions and assess costs and fees. Petitioner sought summary judgment by referencing the IDA. Respondents cross-moved to compel discovery and for the immediate payment of a cash dividend received subsequent to Saxton's death.

█ Surrogate's Court denied petitioner's summary judgment motion but partially granted respondents' cross motion for discovery and ordered that the dividend be paid.[4] At the conclusion of a trial commenced in March 1998, the court directed that petitioner be surcharged and, in the decree of judicial

---

4. This matter came before us on two separate occasions on issues unrelated to the instant appeal (*see*, 245 AD2d 733; 219 AD2d 85).

settlement of the final accounts in April 1999, ordered that petitioner transfer account assets totaling slightly over $16,000 to respondents, return its commissions over the life of the trust, and pay respondents a surcharge of $6,681,038.49, plus interest. Further denying respondents' request for an award of counsel fees and the bulk of counsel fees requested by petitioner, these cross appeals ensued.[5]

During the time period at issue, applicable law required that a trustee employ diligence and prudence in the care and management of a trust equivalent to that of a prudent person of discretion and intelligence in managing his or her own affairs (see, EPTL former 11-2.2 [a] [1]; *King v Talbot*, 40 NY 76).[6] Whether a fiduciary has acted prudently is a factual determination which must assess "whether, under all the facts and circumstances of the particular case, the fiduciary violated the prudent person standard in maintaining a concentration of a particular stock in the estate's portfolio of investments" (*Matter of Janes*, 90 NY2d 41, 51). In so making such determination, the Court of Appeals has guided as follows: "[T]he court should engage in " "a balanced and perceptive analysis of [the fiduciary's] consideration and action in light of the history of each individual investment, viewed at the time of its action or its omission to act" ' (*Matter of Donner*, 82 NY2d 574, 585 [quoting *Matter of Bank of N. Y.*, 35 NY2d 512, 519]). And, while a court should not view each act or omission aided or enlightened by hindsight * * * a court may, nevertheless, examine the fiduciary's conduct over the entire course of the investment in determining whether it has acted prudently [citation omitted]" (*id.*, at 50).

As a corporate fiduciary, petitioner was required to consider, *inter alia*, the testator's primary objectives and undertake a formal analysis of the estate to establish an investment plan consistent therewith which complied with its own internal trustee review protocols. In such vein, "more than routine reviews" (*Matter of Janes, supra*, at 54) were required. "Although this Court in a nonjury trial is not limited to determining whether the findings of the trial court are supported by the weight of the credible evidence, deference will still be given to the trial court's assessment of credibility issues" (*J & J*

5. The New York Banker's Association (hereinafter NYBA) filed an *amicus curiae* brief.

6. The Prudent Investor Act is not applicable to investments made before January 1, 1995 and therefore does not apply to this matter (see, EPTL 11-2.3 [a]).

*Structures v Callanan Indus.*, 215 AD2d 890, 891, *lv denied* 86 NY2d 708).

Here, petitioner's employees and experts conceded that its own written policies of April 1987, supplemented in 1991, required that a prudent person would have diversified the corpus of this trust. Petitioner's experts agreed that Nesbitt's position that the trust not be diversified as long as IBM was on the "buy list" was unjustified. Upon these facts, Surrogate's Court's finding of imprudence is well supported.

With respect to petitioner's contention that the IDA, as a contract, insulated it from such liability, we disagree. Where a beneficiary has requested or consented to what essentially amounts to mismanagement by a fiduciary, equitable rather than contractual principles must govern (*see, e.g., Matter of Ryan*, 291 NY 376; *see also, Villard v Villard*, 219 NY 482; *Matter of Kern*, 159 Misc 682). Hence, petitioner, as the fiduciary, must demonstrate, if the IDA is to be enforced as a contract, that the beneficiaries had the intent to form a contract and so formed it with actual and full knowledge of all legal rights (*see, Matter of Ryan, supra*, at 417; *Matter of Newhoff*, 107 AD2d 417, 422, *lv denied* 66 NY2d 605; *see also, Matter of Junkersfeld*, 244 App Div 260, 266).[7]

Record evidence does not support this assertion. Prior to the instrument being prepared and its subsequent distribution to respondents, not a scintilla of evidence indicates that petitioner fully apprized Saxton or respondents of the effects that their execution of the IDA would have on their legal rights or how their direction to hold the entirety of the trust's corpus in IBM stock would fall far short of what would have been required of a prudent corporate trustee.

Further analyzing the IDA on equitable estoppel grounds— that which rests on the conduct or word of one party upon which another justifiably relies and, in so relying, changes a position and incurs a detriment (*see, Triple Cities Constr. Co. v Maryland Cas. Co.*, 4 NY2d 443)—we note that although the beneficiaries appeared to consent to the stock's retention, such consent must be informed (*see, Matter of Newhoff, supra*). Even if the execution of the IDA could be found to support the stock's retention, the record validates the finding by Surrogate's Court

---

7. Acknowledging that the legal theory propounded on appeal by petitioner—that it was a party to the document signed by its predecessor in interest—is different than the theory it advanced at trial—that it was a third-party beneficiary—we still find it properly preserved (*see, Capital Med. Sys. v Fuji Med. Sys.*, 239 AD2d 743).

that such consent was withdrawn in 1987, first when meeting with Nesbitt in July 1987 and then by Crittenden's letter to Nesbitt in August 1987. As a trustee may not delegate his or her investment authority to a beneficiary or others (*see, id.*), even with acquiescence by some, a duty to the nonconsenting beneficiaries will remain (*see, Matter of Kern, supra; see also, Sherman v Parish*, 53 NY 483; *Matter of Junkersfeld*, 244 App Div 260, *supra*).

While we agree that a fiduciary's conduct must not be viewed in hindsight but rather over the entire course of the investment (*see, Matter of Donner*, 82 NY2d 574, *supra*), once imprudence is determined a court may designate a reasonable time within which divestiture should have occurred (*see, Matter of Janes*, 90 NY2d 41, *supra*). The determination by Surrogate's Court that August 10, 1987 was the date of the breach is supported by the language in Crittenden's letter informing petitioner that it remained under a continuing obligation to immediately develop and present a diversification plan in the face of IBM's declining value and by expert testimony confirming that diversification in these circumstances was the only prudent course. We also agree that 30 days would have been sufficient to facilitate notice to the beneficiaries and a proper analysis of the market, there being no change in the tax consequences at this point. As no fixed standard exists for the time in which divestiture of an imprudently held investment must occur (*see, Matter of Weston*, 91 NY 502, 511), we find no error and reject the NYBA's contention that Surrogate's Court's determination created an inflexible 90/30 rule.

As to damages, a recalculation must occur. When executors retain a stock which they had a duty to sell, the amount of damages paid to a beneficiary should be reduced by the Federal estate tax that the beneficiary would have had to pay if the stock had been sold (*see, Matter of Garvin*, 256 NY 518, 521). It has also been established that "[w]here, as here, a fiduciary's imprudence consists solely of negligent retention of assets it should have sold, the measure of damages is the value of the lost capital" (*Matter of Janes*, 90 NY2d 41, 55, *supra*).

Without reviewing matters which are dehors the record (*see, Owen v BLC Fly Fishers*, 262 AD2d 922), a determination of the amount of lost capital requires a review of the net after-tax proceeds that would represent the capital available to the trust after sale. Here, as the court is obligated to determine the value of the stock on the date it should have been sold as determined by the prudent investor rule (*see, Matter of Weston*,

*supra,* at 511) and subtract from that base the value of the stock at the time of the accounting (*see, Matter of Janes, supra,* at 55), the review was required to include an assessment of the value of the stock, reduced by the capital gains tax,[8] if 90% of the stock was sold within 30 days of August 10, 1987 (*see, Matter of Garvin, supra*).

Furthermore, although possessing considerable discretion regarding the imposition of interest, its rate and the method of compounding, if any (*see, Matter of Janes, supra; Matter of Rowe,* 274 AD2d 87 [decided herewith]), we conclude that Surrogate's Court erred in computing interest on only the lost capital, i.e., the difference between the amount that would have been realized had 90% of the IBM stock been sold on September 10, 1987 and the value of the stock when it was actually distributed to respondents in July 1993, and then deducting the amount of dividends and other income attributable to the retained stock. The court should have employed the damages methodology of *Matter of Janes* (*supra*) and computed interest on the full value of the stock at the time when it should have been sold and then deducted the value of the stock when actually distributed, as well as the dividends and other income attributable to the retained stock.

As to the determination by Surrogate's Court to deny commissions despite no finding of self-dealing or fraud, we find it to be error since there exists no statutory basis upon which the court could deny commissions "upon the exercise of its discretion" (SCPA 2309, 2312); the beneficiary is simply entitled to be put in the position he or she would have occupied had no breach occurred (*see, e.g., Matter of Rothko,* 84 Misc 2d 830, *mod* 56 AD2d 499, *affd* 43 NY2d 305).

Turning to counsel fees, they may not be collected by a prevailing litigant where there is no agreement, statute or rule providing for such fees and where the losing party has not acted maliciously or in bad faith (*see, Bibeau v Ward,* 228 AD2d 943, *lv denied* 89 NY2d 804). Applying these principles and acknowledging that an award of counsel fees may, at other times, fall within the discretion of the trial court (*see, Caristo Constr. Corp. v Diners Fin. Corp.,* 21 NY2d 507), we find no abuse of discretion by Surrogate's Court in the denial of an award.

---

**8.** In so finding, we agree with petitioner that the issue of capital gains taxes was not paramount in *Matter of Janes* (*supra*) since the majority of the estate in that case was to be left to charity.

Finally, addressing challenges to the exclusion of deposition testimony and a draft revocation agreement, the order in which such testimony was introduced and various privilege issues, we reject each such challenge as meritless after our full review.

MERCURE, J. P., CREW III, SPAIN and GRAFFEO, JJ., concur.

Ordered that the decree is modified, on the law, without costs, by reversing so much thereof as established the amount of the surcharge and interest to be paid by petitioner; matter remitted to the Surrogate's Court of Broome County for a redetermination of the amount of the surcharge and interest in accordance with this Court's decision; and, as so modified, affirmed.