■ In the Matter of a Trust Created by CHARLOTTE P. HYDE, Deceased. GLENS FALLS NATIONAL BANK AND TRUST COMPANY et al., as Trustees of a Trust Created by CHARLOTTE P. HYDE, Deceased, Respondents; LOUIS H. WHITNEY et al., Appellants. (Proceeding No. 1.) In the Matter of a Trust Created by CHARLOTTE P. HYDE, Deceased. GLENS FALLS NATIONAL BANK AND TRUST COMPANY et al., as Trustees of a Trust Created by

CHARLOTTE P. HYDE, Deceased, Respondents; LOUIS H. WHITNEY et al., Appellants. (Proceeding No. 2.) In the Matter of a Trust Created by NELL PRUYN CUNNINGHAM, Deceased. BANKNORTH, N.A., et al., as Trustees of a Trust Created by NELL PRUYN CUNNINGHAM, Deceased, Respondents; LOUIS H. WHITNEY et al., Appellants. (Proceeding No. 3.) [845 NYS2d 833]—

Mugglin, J. Appeal from an order of the Surrogate's Court of Warren County (Hall, Jr., S.), entered January 4, 2007, which dismissed respondents' objections to the accountings of three trusts.

Charlotte P. Hyde and Nell Pruyn Cunningham were the daughters of Samuel Pruyn, who was a founder of Finch, Pruyn & Company, Inc. (hereinafter Finch Pruyn), a large manufacturer located in the City of Glens Falls, Warren County. Hyde established multiple testamentary trusts to manage her estate upon her death, while Cunningham set up an inter vivos trust in 1935 to manage her estate. Two Hyde trusts and one Cunningham trust are the subject of these accounting proceedings. Each trust is funded with large concentrations of Finch Pruyn common stock. Finch Pruyn is a closely held family corporation whose stock is not publicly traded. Each trust instrument granted the trustees absolute discretion in managing trust assets and contained no directions concerning the disposition of the Finch Pruyn stock.

Proceeding No. 1 involves an accounting from November 20, 1981 to February 28, 2005 in the administration of the trust created by Article Seventh of the Hyde will. Proceeding No. 2 concerns the trust created by Article Ninth of the Hyde will and covers the period from March 15, 1980 to October 23, 2000. The accounting in proceeding No. 3 involves the administration of the Cunningham trust from January 14, 1982 to January 31, 2003.

Petitioners in proceeding Nos. 1 and 2, Glens Falls National Bank and Trust Company (hereinafter GFNBT) and Samuel Hoopes, sought intermediate accountings of the Hyde Article Seventh and Hyde Article Ninth trusts, and petitioners in proceeding No. 3, Banknorth, N.A. and Byron J. Lapham Jr., sought an intermediate accounting of the Cunningham trust. Respondents, the trust beneficiaries, filed objections to all of the accountings alleging, among other things, breach of fiduciary

duty due to petitioners' failure to diversify the trusts' investment portfolios. Respondents also sought to surcharge petitioners and deprive them of their commissions. All petitioners thereafter moved for summary judgment dismissing the objections on various grounds. The motion was denied by Surrogate's Court, and a joint trial without a jury was held on the accountings. At the conclusion of a lengthy trial, Surrogate's Court dismissed all of the objections. Respondents appeal.

Respondents' eight appellate arguments distill to a single contention that Surrogate's Court erred in finding that petitioners' management of the trusts comported with the prudent investor rule, which became effective on January 1, 1995. Specifically, respondents contend that petitioners failed to adequately diversify the investment portfolios of the trusts.

Prior to January 1, 1995, New York followed the prudent person rule of investment, which "required that a trustee employ diligence and prudence in the care and management of a trust equivalent to that of a prudent person of discretion and intelligence in managing his or her own affairs" (*Matter of Saxton*, 274 AD2d 110, 118 [2000]; *see Matter of Rowe*, 274 AD2d 87, 90-91 [2000], *lv denied* 96 NY2d 707 [2001]). "[T]he prudent person standard dictates against any absolute rule that a fiduciary's failure to diversify, in and of itself, constitutes imprudence" (*Matter of Janes*, 90 NY2d 41, 50 [1997]; *see Matter of Newhoff*, 107 AD2d 417, 421-422 [1985], *lv denied* 66 NY2d 605 [1985]). Rather, "[t]he inquiry is simply whether, under all the facts and circumstances of the particular case, the fiduciary violated the prudent person standard in maintaining a concentration of a particular stock in the estate's portfolio of investments" (*Matter of Janes*, 90 NY2d at 51; *see Matter of Saxton*, 274 AD2d at 118-119; *see also Matter of Strong*, 289 AD2d 798, 799-800 [2001]). In making this determination, a court should perform " 'a balanced and perceptive analysis of [the fiduciary's] consideration and action in . . . light of the history of each individual investment, viewed at the time of its action or its omission to act' " (*Matter of Donner*, 82 NY2d 574, 585 [1993], quoting *Matter of Bank of N.Y.*, 35 NY2d 512, 519 [1974]).

For investments made or held by a trustee on or after January 1, 1995 (*see* EPTL 11-2.3 [a]; *Matter of Janes*, 90 NY2d at 50 n), "[a] trustee has a duty to invest and manage property held in a fiduciary capacity in accordance with the prudent investor standard" (EPTL 11-2.3 [a]). The prudent investor standard requires a trustee "to diversify assets unless the trustee reasonably determines that it is in the interests of the beneficia-

ries not to diversify, taking into account the purposes and terms and provisions of the governing instrument" (EPTL 11-2.3 [b] [3] [C]). The diversification mandate of the new rule was generally consistent with the diversification standards already developed by the courts under the prudent person rule (*see e.g. Matter of Janes*, 90 NY2d 41 [1997]; *Matter of Strong*, 289 AD2d 798 [2001]; *Matter of Rowe*, 274 AD2d 87 [2000]; *Matter of Saxton*, 274 AD2d 110 [2000]). Whether a trustee has acted in conformity with the prudent investor rule is a determination which must be made in light of all the surrounding facts and circumstances (*see* EPTL 11-2.3 [b] [1]). Notably, an entity that holds itself out as having special investment skills, such as a bank, is held to a higher standard—that of a prudent investor "of discretion and intelligence having special investment skills" (EPTL 11-2.3 [b] [6]).

" 'Although this Court in a nonjury trial is not limited to determining whether the findings of the trial court are supported by the weight of the credible evidence, deference will still be given to the trial court's assessment of credibility issues' " (*Matter of Saxton*, 274 AD2d at 118, quoting *J & J Structures v Callanan Indus.*, 215 AD2d 890, 891 [1995], *lv denied* 86 NY2d 708 [1995]; *see Matter of Rowe*, 274 AD2d at 92). Whether a trustee has acted prudently is a factual determination that is generally made by the trial court (*see Matter of Janes*, 90 NY2d at 50).

Turning to proceedings Nos. 1 and 2, it is first noted that respondents assert appellate arguments only against GFNBT, not Hoopes. Indeed, respondents admit that they never asserted any direct claim against Hoopes. Accordingly, as limited by their brief (*see Matter of Pletcher v New York State Racing & Wagering Bd.*, 35 AD3d 920, 920 [2006], *lv denied* 9 NY3d 802 [2007]), respondents challenge only whether GFNBT abided by its obligations as a fiduciary.

GFNBT was appointed as cotrustee of the Article Seventh trust beginning on June 19, 1995, making the prudent investor rule applicable for the duration of GFNBT's term as cotrustee (*see* EPTL 11-2.3 [a]). However, GFNBT was unaware of its designation as cotrustee until 2004, approximately nine years later. For this reason, many of Surrogate's Court's findings, which relate to events that took place prior to 2004, could not have applied to GFNBT's management of the Article Seventh trust since it did not know of its existence. The decision of Surrogate's Court made no reference to the nine-year period in which GFNBT did not manage the Article Seventh trust, despite being a cotrustee. Notwithstanding a potential finding

that GFNBT was imprudent for neglecting to learn about the Article Seventh trust, and even had it known about the trust and made the requisite determination regarding diversification (*see* EPTL 11-2.3 [b] [3] [C], [D]), it would have concluded (for the reasons hereinafter expressed) that diversification was unnecessary. Because a surcharge is only warranted upon a showing that the trust's losses are causally connected to the trustee's imprudence (*see Matter of Bank of N.Y.*, 35 NY2d at 519; *Matter of Hahn*, 93 AD2d 583, 588 [1983], *affd* 62 NY2d 821 [1984]), Surrogate's Court properly dismissed the objections to the Article Seventh trust.

Next, in proceeding No. 2, GFNBT made a reasonable determination that it was in the interests of the beneficiaries not to diversify the Finch Pruyn stock contained in the Article Ninth trust (*see* EPTL 11-2.3 [b] [3] [C]). First, GFNBT considered the liquidity of Finch Pruyn stock in making its decision not to diversify (*see* EPTL 11-2.3 [b] [3] [B]). Relevant to this determination was the fact that Finch Pruyn is a closely held corporation with an unusual capital structure. Under Finch Pruyn's capital structure, the class A shareholders held all of the voting rights and, therefore, controlled whether the corporation could be liquidated. However, class A shareholders would only receive $0.01 per share upon liquidation of the corporation. Class B shareholders would receive all the remaining proceeds upon liquidation but, without any voting rights, they have no power to effectuate a liquidation. This capital structure engendered a state of "gridlock," which may have been intended by Finch Pruyn's founders in order to sustain Finch Pruyn as a family business.

Several experienced trust officers from GFNBT testified that, because Finch Pruyn is a closely held corporation (*compare Matter of Janes*, 90 NY2d at 50-54 [Kodak stock]; *Matter of Saxton*, 274 AD2d at 118-119 [IBM stock]; *Matter of Rowe*, 274 AD2d at 92 [IBM stock]), there was no market for its stock and, as a result, it would only be possible to sell the stock at a speculative price. The Court of Appeals has recognized that valuing a closely held corporation is a difficult task and shareholders are "unlikely to find prospective buyers for their shares" (*Matter of Seagroatt Floral Co. [Riccardi]*, 78 NY2d 439, 445 [1991]). Indeed, the testimony adduced at trial showed that the Finch Pruyn stock did not attract buyers; in fact, Finch Pruyn itself was not interested in purchasing the stock, except in small quantities at less than book value. Representatives from GFNBT held meetings with various financial advisors, including investment bankers and brokerage houses, and

determined that a fair price for the stock could only be obtained via a sale of the entire company.

The unusual capital structure made the stocks particularly unmarketable. Although a recapitalization of Finch Pruyn occurred in 1999, there was credible expert testimony that "the fundamental situation had not changed" and there was still no market for the stock. These circumstances support a conclusion that GFNBT prudently managed the Article Ninth trust (*cf. Matter of Hahn*, 93 AD2d 583 [1983]). Notably also, Surrogate's Court discredited respondents' experts (*see Matter of Saxton*, 274 AD2d at 118), who testified that GFNBT should have sold a large quantity of the Finch Pruyn stock within six months of January 1, 1995, the effective date of the prudent investor rule.

Additionally, GFNBT determined not to diversify upon consideration of other factors, such as the general economic situation of the trust assets, the expected tax consequences of investment decisions and the needs of the beneficiaries (*see* EPTL 11-2.3 [b] [3] [B]). Specifically, GFNBT regularly reviewed the financial condition of the trusts' assets based on a variety of internal reports and audits. As to tax consequences, GFNBT assessed that the Finch Pruyn assets incurred a low tax cost. Compared to the high capital gains taxes that would result from a sale of the stock, GFNBT determined that retention of the stock was the most advantageous means of maintaining the trust.

Finally, GFNBT concluded that the needs of the beneficiaries militated against diversification. The Finch Pruyn stock paid out considerable dividends such that selling the shares at a discounted price, for the sake of diversification, may have been imprudent. More importantly, there is an indication that the settlors of the trust wanted the ownership of Finch Pruyn to remain in the family and the trusts were used as vehicles to achieve such a result. GFNBT partially based its determination not to diversify on the family nature of the corporation, a material consideration according to the legislative history of EPTL 11-2.3 (*see* Senate Introducer Mem in Support of Prudent Investor Act, Bill Jacket, L 1994, ch 609). Under all of the above circumstances, and giving appropriate deference to credibility determinations (*see Matter of Janes*, 90 NY2d at 50; *Matter of Saxton*, 274 AD2d at 118), the finding that GFNBT's management of the Article Ninth trust comported with the requirements of the prudent investor rule will not be disturbed.

In proceeding No. 3, we again note that respondents assert their appellate arguments only against Banknorth, not Lapham. Respondents admit that they have no direct claims against

Lapham, the individual trustee. Accordingly, as limited by their brief (*see Matter of Pletcher v New York State Racing & Wagering Bd.*, 35 AD3d at 920), respondents challenge only whether Banknorth abided by its obligations as a fiduciary.

We find that Banknorth breached no fiduciary duty in prudently retaining the Cunningham trust's concentration of Finch Pruyn stock following the adoption of the prudent investor rule in 1995. Shortly after this rule became effective, Banknorth received a letter from John Beeman, a member of the Pruyn family, stating that Finch Pruyn was offering to repurchase shares at a heavily discounted price. Following receipt of this letter, Banknorth reasonably determined that it was not in the best interests of the beneficiaries to sell the stock at a discounted price merely for the sake of diversification. Banknorth was cognizant of the lack of liquidity of Finch Pruyn stock, the unmarketability of the class B stock and the capital structure of Finch Pruyn, as hereinbefore discussed. Even so, Banknorth regularly explored the market for Finch Pruyn stock and kept well informed of Finch Pruyn's financial condition.

Banknorth also regularly reviewed a series of Finch Pruyn reports which detailed proposals to recapitalize Finch Pruyn stock, and determined that the stock would continue to lack marketability. Although respondents argue that Banknorth inappropriately relied on evaluations and reports authored by Finch Pruyn in deciding not to diversify, we agree with the observation of Surrogate's Court that, in so relying on those reports, Banknorth was "fulfilling [its] duty to reasonably determine whether to diversify. Further, [its] actions reduced the trust expenses by avoiding a costly duplication of reports." Based on the reports, Banknorth concluded that the recapitalization which eventually occurred in 1999 "provide[d] nothing in the way of immediate liquidity nor d[id] it even express a commitment on the part of Finch Pruyn that it will explore liquidity options."

Crew III, J.P., Rose, Lahtinen and Kane, JJ., concur. Ordered that the order is affirmed, with one bill of costs.