OPINION OF THE COURT
 

 Levine, J.
 

 Former State Senator and businessman Rodney B. Janes (testator) died on May 26, 1973, survived solely by his wife, Cynthia W. Janes, who was then 72 years of age. Testator’s $3,500,000 estate consisted of a $2,500,000 stock portfolio, approximately 71% of which consisted of 13,232 shares of common stock of the Eastman Kodak Company. The Kodak stock had a date-of-death value of $1,786,733, or approximately $135 per share.
 

 
 *47
 
 Testator’s 1963 will and a 1969 codicil bequeathed most of his estate to three trusts. First, the testator created a marital deduction trust consisting of approximately 50% of the estate’s assets, the income of which was to be paid to Mrs. Janes for her life. In addition, it contained a generous provision for invasion of the principal for Mrs. Janes’s benefit and gave her testamentary power of appointment over the remaining principal. The testator also established a charitable trust of approximately 25% of the estate’s assets which directed annual distributions to selected charities. A third trust comprised the balance of the estate’s assets and directed that the income therefrom be paid to Mrs. Janes for her life, with the remainder pouring over into the charitable trust upon her death.
 

 On June 6, 1973, the testator’s will and codicil were admitted to probate. Letters testamentary issued to petitioner’s predecessor, Lincoln Rochester Trust Company, and Mrs. Janes, as coexecutors, on July 3, 1973. Letters of trusteeship issued to petitioner alone. By early August 1973, petitioner’s trust and estate officers, Ellison Patterson and Richard Young, had ascertained the estate’s assets and the amount of cash needed for taxes, commissions, attorneys’ fees, and specific bequests.
 

 In an August 9, 1973 memorandum, Patterson recommended raising the necessary cash for the foregoing administrative expenses by selling certain assets, including 800 shares of Kodak stock, and holding “the remaining issues * * * until the [tjrusts [were] funded.” The memorandum did not otherwise address investment strategy in light of the evident primary objective of the testator to provide for his widow during her lifetime. In a September 5, 1973 meeting with Patterson and Young, Mrs. Janes, who had a high school education, no business training or experience, and who had never been employed, consented to the sale of some 1,200 additional shares of Kodak stock. Although Mrs. Janes was informed at the meeting that petitioner intended to retain the balance of the Kodak shares, none of the factors that would lead to an informed investment decision was discussed. At that time, the Kodak stock traded for about $139 per share; thus, the estate’s 13,232 shares of the stock were worth almost $1,840,000. The September 5 meeting was the only occasion where retention of the Kodak stock or any other investment issues were taken up with Mrs. Janes.
 

 By the end of 1973, the price of Kodak stock had fallen to about $109 per share. One year later, it had fallen to about $63 per share and, by the end of 1977, to about $51 per share. In March 1978, the price had dropped even further, to about $40
 
 *48
 
 per share. "When petitioner filed its initial accounting in February 1980, the remaining 11,320 shares were worth, approximately $530,000, or about $47 per share. Most of the shares were used to fund the trusts in 1986 and 1987.
 

 In addition to its initial accounting in 1980, petitioner filed a series of supplemental accountings that together covered the period from July 1973 through June 1994. In August 1981, petitioner sought judicial settlement of its account. Objections to the accounts were originally filed by Mrs. Janes in 1982, and subsequently by the Attorney-General on behalf of the charitable beneficiaries (collectively, "objectants”). In seeking to surcharge petitioner for losses incurred by the estate due to petitioner’s imprudent retention of a high concentration of Kodak stock in the estate from July 1973 to February 1980, during which time the value of the stock had dropped to about one third of its date-of-death value, objectants asserted that petitioner’s conduct violated EPTL 11-2.2 (a) (1), the so-called "prudent person rule” of investment. When Mrs. Janes died in 1986, the personal representative of her estate was substituted as an objectant.
 

 Following a trial on the objections, the Surrogate found that petitioner, under the circumstances, had acted imprudently and should have divested the estate of the high concentration of Kodak stock by August 9, 1973. The court imposed a $6,080,269 surcharge against petitioner and ordered petitioner to forfeit its commissions and attorneys’ fees. In calculating the amount of the surcharge, the court adopted a "lost profits” or "market index” measure of damages espoused by objectants’ expert — what the proceeds of the Kodak stock would have yielded, up to the time of trial, had they been invested in petitioner’s own diversified equity fund on August 9, 1973.
 

 The Appellate Division modified solely as to damages, holding that "the Surrogate properly found [petitioner] liable for its negligent failure to diversify and for its inattentiveness, inaction, and lack of disclosure, but that the Surrogate adopted an improper measure of damages”
 
 (Matter of Janes,
 
 223 AD2d 20, 22). In a comprehensive opinion by Presiding Justice M. Dolores Denman, the Court held that the Surrogate’s finding of imprudence, as well as its selection of August 9, 1973 as the date by which petitioner should have divested the estate of its concentration of Kodak stock, were "well supported” by the record
 
 (id.,
 
 at 29). The Court rejected the Surrogate’s "lost profits” or "market index” measure of damages, however, holding that the proper measure of damages was "the value of the
 
 *49
 
 capital that was lost” — the difference between the value of the stock at the time it should have been sold and its value when ultimately sold
 
 (id.,
 
 at 34). Applying this measure, the Court reduced the surcharge to $4,065,029. We granted petitioner and objectants leave to appeal, and now affirm.
 

 I. Petitioner’s Liability
 

 Petitioner argues that New York law does not permit a fiduciary to be surcharged for imprudent management of a trust for failure to diversify in the absence of additional elements of hazard, and that it relied upon, and complied with, this rule in administering the estate. Relying on
 
 Matter of Balfe
 
 (152 Misc 739, 749,
 
 mod
 
 245 App Div 22), petitioner claims that elements of hazard can be capsulized into deficiencies in the following investment quality factors: "(i) the capital structure of the company; (ii) the competency of its management; (iii) whether the company is a seasoned issuer of stock with a history of profitability; (iv) whether the company has a history of paying dividends; (v) whether the company is an industry leader; (vi) the expected future direction of the company’s business; and (vii) the opinion of investment bankers and analysts who follow the company’s stock.” Evaluated under these criteria, petitioner asserts, the concentration of Kodak stock at issue in this case, that is, of an acknowledged "blue chip” security popular with investment advisors and many mutual funds, cannot be found an imprudent investment on August 9, 1973 as a matter of law. In our view, a fiduciary’s duty of investment prudence in holding a concentration of one security may not be so rigidly limited.
 

 New York followed the prudent person rule of investment during the period of petitioner’s administration of the instant estate. This rule provides that "[a] fiduciary holding funds for investment may invest the same in such securities as would be acquired by prudent [persons] of discretion and intelligence in such matters who are seeking a reasonable income and the preservation of their capital” (EPTL 11-2.2 [a] [1]).
 
 *
 
 Codified in 1970
 
 (see,
 
 L 1970, ch 321), the prudent person rule’s New York common-law antecedents can be traced to
 
 King v Talbot
 
 (40 NY 76), wherein this Court stated:
 

 
 *50
 
 "[T]he trustee is bound to employ such diligence and such prudence in the care and management [of the trust], as in general, prudent men of discretion and intelligence in such matters, employ in their own like affairs.
 

 "This necessarily excludes all speculation, all investments for an uncertain and doubtful rise in the market, and, of course,
 
 everything that does not take into view the nature and object of the trust, and the consequences of a mistake in the selection of the investment to be made.
 
 * * *
 

 "/T]he preservation of the fund, and the procurement of a just income therefrom, are primary objects
 
 of the creation of the trust itself, and are to be primarily regarded”
 
 (id.,
 
 at 85-86 [emphasis supplied]).
 

 No precise formula exists for determining whether the prudent person standard has been violated in a particular situation; rather, the determination depends on an examination of the facts and circumstances of each case
 
 (see, Purdy v Lynch,
 
 145 NY 462, 475;
 
 see also, Matter of Hahn,
 
 62 NY2d 821, 824). In undertaking this inquiry, the court should engage in " 'a balanced and perceptive analysis of [the fiduciary’s] consideration and action in light of the history of each individual investment, viewed at the time of its action or its omission to act’ ”
 
 (Matter of Donner,
 
 82 NY2d 574, 585 [quoting
 
 Matter of Bank of N. Y.,
 
 35 NY2d 512, 519]). And, while a court should not view each act or omission aided or enlightened by hindsight
 
 (see, Matter of Bank of N. Y., supra,
 
 at 519;
 
 see also, Matter of Clark,
 
 257 NY 132, 136;
 
 Purdy v Lynch, supra,
 
 at 475-476), a court may, nevertheless, examine the fiduciary’s conduct over
 
 the entire course of the investment
 
 in determining whether it has acted prudently
 
 (see, Matter of Donner, supra,
 
 at 585-586). Generally, whether a fiduciary has acted prudently is a factual determination to be made by the trial court
 
 (see, id.; see also, Matter of Rothko,
 
 43 NY2d 305, 318;
 
 Matter of Hubbell,
 
 302 NY 246, 258).
 

 As the foregoing demonstrates, the very nature of the prudent person standard dictates against any absolute rule that a fiduciary’s failure to diversify, in and of itself, constitutes imprudence, as well as against a rule invariably immunizing a fiduciary from its failure to diversify in the absence of some selective list of elements of hazard, such as those identified by petitioner. Indeed, in various cases, courts have
 
 *51
 
 determined that a fiduciary’s retention of a high concentration of one asset in a trust or estate was imprudent without reference to those elements of hazard
 
 (see, Matter of Dormer, supra,
 
 at 585-586;
 
 see also, Matter of Curtiss,
 
 261 App Div 964,
 
 affd without opn
 
 286 NY 716;
 
 Cobb v Gramatan Natl. Bank & Trust Co.,
 
 261 App Div 1086). The inquiry is simply whether, under all the facts and circumstances of the particular case, the fiduciary violated the prudent person standard in maintaining a concentration of a particular stock in the estate’s portfolio of investments.
 

 Moreover, no court has stated that the limited elements of hazard outlined by petitioner are the only factors that may be considered in determining whether a fiduciary has acted prudently in maintaining a concentrated portfolio. Again, as commentators have noted, one of the primary virtues of the prudent person rule
 
 "lies in its lack of specificity,
 
 as this permits the propriety of the trustee’s investment decisions to be measured in light of the business and economic circumstances existing at the time they were made” (Laurino,
 
 Investment Responsibility of Professional Trustees,
 
 51 St John’s L Rev 717, 723 [1977] [emphasis supplied]).
 

 Petitioner’s restrictive list of hazards omits such additional factors to be considered under the prudent person rule by a trustee in weighing the propriety of
 
 any
 
 investment decision, as: "the amount of the trust estate, the situation of the beneficiaries, the trend of prices and of the cost of living, the prospect of inflation and of deflation” (Restatement [Second] of Trusts § 227, comment
 
 e).
 
 Other pertinent factors are the marketability of the investment and possible tax consequences
 
 (id.,
 
 comment
 
 o).
 
 The trustee must weigh all of these investment factors as they affect the principal objects of the testator’s or settlor’s bounty, as between income beneficiaries and remainder persons, including decisions regarding "whether to apportion the investments between high-yield or high-growth securities” (Turano and Radigan, New York Estate Administration ch 14, § P, at 409 [1986]).
 

 Moreover, and especially relevant to the instant case, the various factors affecting the prudence of any particular investment must be considered in the light of the "circumstances of the trust itself rather than [merely] the integrity of the particular investment” (9C Rohan, NY Civ Prac — EPTL ¶ 11-2.2 [5], at 11-513, n 106 [1996]). As stated in a leading treatise:
 

 "[t]he trustee should take into consideration the
 
 *52
 
 circumstances of the particular trust that he is administering, both as to the size of the trust estate and the requirements of the beneficiaries. He should consider each investment
 
 not as an isolated transaction but in its relation to the whole of the trust estate” (3
 
 Scott, Trusts § 227.12, at 477 [4th ed]).
 

 Our case law is entirely consistent with the foregoing authorities. Thus, in
 
 Matter of Bank of N. Y.
 
 (35 NY2d 512,
 
 supra),
 
 although we held that a trustee remains responsible for imprudence as to each individual investment in a trust portfolio, we stated:
 

 "The record of any individual investment is not to be viewed exclusively, of course, as though it were in its own water-tight compartment,
 
 since to some extent individual investment decisions may properly be affected by considerations of the performance of the fund as an entity, as in the instance, for example, of individual security decisions based in part on considerations of diversification of the fund or of capital transactions to achieve sound tax planning for the fund as a whole. The focus of inquiry, however, is nonetheless on the individual security as such and factors relating to the entire portfolio are to be weighed only along with others in reviewing the prudence of the particular investment decisions” (35 NY2d, at 517,
 
 supra
 
 [emphasis supplied]).
 

 Thus, the elements of hazard petitioner relies upon as demonstrating that, as a matter of law, it had no duty to diversify, suffer from two major deficiencies under the prudent person rule. First, petitioner’s risk elements too narrowly and strictly define the scope of a fiduciary’s responsibility in making any individual investment decision, and the factors a fiduciary must consider in determining the propriety of a given investment.
 

 A second deficiency in petitioner’s elements of hazard list is that all of the factors relied upon by petitioner go to the propriety of an individual investment "exclusively * * * as though it were in its own water-tight compartment”
 
 (Matter of Bank of N. Y., supra,
 
 at 517), which would encourage a fiduciary to treat each investment as an isolated transaction rather than "in its relation to the whole of the trust estate” (3 Scott,
 
 *53
 

 op. cit.,
 
 at 477). Thus, petitioner’s criteria for elements of hazard would apply irrespective of the
 
 concentration
 
 of the investment security under consideration in the portfolio. That is, the existence of any of the elements of risk specified by petitioner in a given corporate security would militate against the investment even in a
 
 diversified
 
 portfolio, obviating any need to consider concentration as a reason to divest or refrain from investing. This ignores the market reality that, with respect to some investment vehicles, concentration itself may create or add to risk, and essentially takes lack of diversification out of the prudent person equation altogether.
 

 Likewise, contrary to petitioner’s alternative attack on the decisions below, neither the Surrogate nor the Appellate Division based their respective rulings holding petitioner liable on any absolute duty of a fiduciary to diversify. Rather, those courts determined that a surcharge was appropriate because maintaining a concentration in Kodak stock, under the circumstances presented, violated certain critical obligations of a fiduciary in making investment decisions under the prudent person rule. First, petitioner failed to consider the investment in Kodak stock in relation to the entire portfolio of the estate
 
 (see, Matter of Bank of N. Y., supra,
 
 at 517; 3 Scott,
 
 op. cit.),
 
 i.e., whether the Kodak concentration itself created or added to investment risk. The objectants’ experts testified that even high quality growth stocks, such as Kodak, possess some degree of volatility because their market value is tied so closely to earnings projections
 
 (cf.,
 
 Turano and Radigan,
 
 op. cit.,
 
 at 409). They further opined that the investment risk arising from that volatility is significantly exacerbated when a portfolio is heavily concentrated in one such growth stock.
 

 Second, the evidence revealed that, in maintaining an investment portfolio in which Kodak represented 71% of the estate’s stock holdings, and the balance was largely in other growth stocks, petitioner paid insufficient attention to the needs and interests of the testator’s 72-year-old widow, the life beneficiary of three quarters of his estate, for whose comfort, support and anticipated increased medical expenses the testamentary trusts were evidently created. Testimony by petitioner’s investment manager, and by the objectants’ experts, disclosed that the annual yield on Kodak stock in 1973 was approximately 1.06%, and that the aggregate annual income from all estate stockholdings was $43,961, a scant 1.7% of the $2.5 million estate securities portfolio. Thus, retention of a high concentration of Kodak jeopardized the interests of the primary income
 
 *54
 
 beneficiary of the estate and led to the eventual need to substantially invade the principal of the marital testamentary trust. - .
 

 Lastly, there was evidence in the record to support the findings below that, in managing the estate’s investments, petitioner failed to exercise due care and the skill it held itself out as possessing as a corporate fiduciary
 
 (see, Matter of Donner,
 
 82 NY2d, at 578,
 
 supra;
 
 Restatement [Second] of Trusts § 227, Comment on Clause [a]). Notably, there was proof that petitioner (1) failed initially to undertake a formal analysis of the estate and establish an investment plan consistent with the testator’s primary objectives; (2) failed to follow petitioner’s own internal trustee review protocol during the administration of the estate, which advised special caution and attention in cases of portfolio concentration of as little as 20%; and (3) failed to conduct more than routine reviews of the Kodak holdings in this estate, without considering alternative investment choices, over a seven-year period of steady decline in the value of the stock.
 

 Since, thus, there was evidence in the record to support the foregoing affirmed findings of imprudence on the part of petitioner, the determination of liability must be affirmed
 
 (Matter of Donner,
 
 82 NY2d, at 584,
 
 supra).
 

 II. Date of Divestiture
 

 As we have noted, in determining whether a fiduciary has acted prudently, a court may examine a fiduciary’s conduct throughout the entire period during which the investment at issue was held
 
 (see, Matter of Donner, 82
 
 NY2d, at 585-586,
 
 supra).
 
 The court may then determine, within that period, the "reasonable time” within which divesture of the imprudently held investment should have occurred
 
 (see, Matter of Weston,
 
 91 NY 502, 510-511). What constitutes a reasonable time will vary from casé to case and is not fixed or arbitrary
 
 (see, id.,
 
 at 510-511). The test remains "the diligence and prudence of prudent and intelligent [persons] in the management of their own affairs”
 
 (id.,
 
 at 511 [citations omitted]). Thus, in
 
 Donner,
 
 we upheld both the Surrogate’s examination of the fiduciary’s conduct throughout the entire period during which the investment at issue was retained in finding liability,
 
 and
 
 the Surrogate’s selection of the date of the testator’s death as the time when the trustee should have divested the estate of its substantial holdings in high-risk securities (82 NY2d, at 585-586,
 
 supra).
 

 Again, there is evidentiary support in the record for the trial court’s finding, affirmed by the Appellate Division, that a
 
 *55
 
 prudent fiduciary would have divested the estate’s stock portfolio of its high concentration of Kodak stock by August 9, 1973, thereby exhausting our review powers on this issue. Petitioner’s own internal documents and correspondence, as well as the testimony of Patterson, Young, and objectants’ experts, establish that by that date, petitioner had all the information a prudent investor would have needed to conclude that the percentage of Kodak stock in the estate’s stock portfolio was excessive and should have been reduced significantly, particularly in light of the estate’s over-all investment portfolio and the financial requirements of Mrs. Janes and the charitable beneficiaries.
 

 III. Damages
 

 Finally, as to the calculation of the surcharge, we conclude that the Appellate Division correctly rejected the Surrogate’s "lost profits” or "market index” measure of damages. Where, as here, a fiduciary’s imprudence consists solely of negligent retention of assets it should have sold, the measure of damages is the value of the lost capital (see,
 
 Matter of Garvin,
 
 256 NY 518, 521;
 
 see also, Matter of Bonner,
 
 82 NY2d, at 586,
 
 supra).
 
 Thus, the Surrogate’s reliance on
 
 Matter of Rothko
 
 in imposing a "lost profit” measure of damages is inapposite, since in that case the fiduciary’s misconduct consisted of deliberate self-dealing and faithless transfers of trust property (43 NY2d, at 321-322,
 
 supra).
 

 In imposing liability upon a fiduciary on the basis of the capital lost, the court should determine the value of the stock on the date it should have been sold, and subtract from that figure the proceeds from the sale of the stock or, if the stock is still retained by the estate, the value of the stock at the time of the accounting
 
 (see, Matter of Garvin, supra,
 
 at 521;
 
 Matter of Frame,
 
 245 App Div 675, 686; 6 Warren’s Heaton, Surrogates’ Courts § 100.01 [4] [b] [i] [misnumbered in original as § 101.01 (4) (b) (i)], at 100-9 [6th ed rev 1997]). Whether interest is awarded, and at what rate, is a matter within the discretion of the trial court
 
 (see, Woerz v Schumacher,
 
 161 NY 530, 538,
 
 rearg denied
 
 163 NY 610;
 
 King v Talbot, 40
 
 NY, at 95,
 
 supra;
 
 CPLR 5001 [a]; SCPA 2211 [1]; 6 Warren’s Heaton,
 
 op. cit.;
 
 3 Scott,
 
 op. cit.,
 
 § 207, at 255-256). Dividends and other income attributable to the retained assets should offset any interest awarded
 
 (see, Matter of Garvin, supra,
 
 at 521).
 

 Here, uncontradicted expert testimony established that application of this measure of damages resulted in a figure of $4,065,029, which includes prejudgment interest at the legal rate, compounded from August 9, 1973 to October 1, 1994. The
 
 *56
 
 Appellate Division did not abuse its discretion in adding to that figure prejudgment interest from October 1, 1994 through August 17, 1995, $326,302.66 previously received by petitioner for commissions and attorneys’ fees, plus postjudgment interest, costs, and disbursements.
 

 Accordingly, the order of the Appellate Division should be affirmed, without costs.
 

 Chief Judge Kaye and Judges Titone, Bellacosa, Smith, Cipaeick and Wesley concur.
 

 Order affirmed, without costs.
 

 *
 

 The recently enacted Prudent Investor Act requires a trustee "to diversify assets unless the trustee reasonably determines that it is in the interests of the beneficiaries not to diversify, taking into account the purposes and terms and provisions of the governing instrument” (EPTL 11-2.3 [b] [3] [C]). The act applies to investments "made or held” by a trustee on or after January 1, 1995 and, thus, does not apply to the matter before us (EPTL 11-2.3 [a]).