[765 NYS2d 92]

Scalp & Blade, Inc., et al., Appellants, v Advest, Inc., et al., Respondents.

Fourth Department, October 2, 2003

220

---

**APPEARANCES OF COUNSEL**

*McGrath & Polvino, PLLC,* Williamsville (*Donald G. McGrath* of counsel), for appellants.

*Phillips, Lytle, Hitchcock, Blaine & Huber LLP,* Buffalo (*Paul K. Stecker* of counsel), for respondents.

**OPINION OF THE COURT**

KEHOE, J.

Plaintiffs commenced this action against defendants, an investment advisor/securities broker and his firm, seeking damages for defendants' alleged mismanagement of plaintiffs' trust fund or account, including alleged "churning" of the fund and investment of it in a manner unsuited to plaintiffs' needs and purposes. On this appeal by plaintiffs, we address the appealability and propriety of "an order *in limine* precluding plaintiffs from offering proof of additional profits [that] they claim their account would have earned if it had been invested in alternative securities, the performance of which they claim would have tracked the S&P 500 or other market indices." We conclude that the order is appealable as of right and that plaintiffs are not precluded as a matter of law from recovering "market index" or other "lost profit" or "lost appreciation" damages.

## I

Our recitation of the facts is based on the record now before us as well as the records underlying two prior appeals to this Court (*Scalp & Blade v Advest, Inc.,* 300 AD2d 1068 [2002]; *Scalp & Blade v Advest, Inc.,* 281 AD2d 882 [2001]). Plaintiff Scalp & Blade, Inc., a not-for-profit corporation, administers a college scholarship program funded with the income and other

gains from a certain trust fund (fund) held in the form of an investment account. Plaintiff Scalp & Blade Scholarship Association, an unincorporated educational and charitable association comprised of the directors and officers of the corporation, oversees the proper maintenance and investment of the fund. The fund is governed by a Board of Trustees (Board). Defendant Robert J. Franger is an investment advisor and registered securities broker. At all relevant times, Franger was an officer and employee of defendant Advest, Inc. (Advest), a brokerage firm, simultaneously serving not only as investment advisor/broker to the fund's Board, but also as a member of the Board and its investment committee. Around 1986, Franger became the "financial advisor and account representative" for plaintiffs and thereafter made investment decisions concerning the fund, including whether to purchase and sell securities for the fund. Franger allegedly carried out those responsibilities in the course of his employment with Advest, under the supervision of his superiors in the firm.

According to plaintiffs, during the initial years of Franger's management of the fund, its assets were appropriately invested in a diversified mix of high-grade securities. However, plaintiffs allege that, beginning in 1995 and continuing throughout the rest of Franger's tenure as plaintiffs' financial advisor and account representative (i.e., until plaintiffs terminated that relationship in May 1998), Franger failed to diversify his investments of the fund's assets and "engaged in an excessive number of transactions in speculative and risky investments that were completely unsuitable for Plaintiffs and their investment objectives." Plaintiffs allege that Franger, trading as he saw fit, made numerous and frequent short-term trades resulting in financial losses and at one juncture had about 65% of the fund invested in three high-tech, small-cap stocks. Plaintiffs further allege that defendants failed to file paperwork properly earmarking the fund as a "discretionary account," leading to a failure to subject the fund to the close scrutiny typically given to such accounts. In addition, plaintiffs allege that both the frequency of Franger's reporting to plaintiffs and the level of detail provided diminished drastically beginning in 1995, with Franger thereafter concealing both the level of his trading activity and which particular securities he had purchased or sold. Plaintiffs allege that, as a consequence of defendants' actions, the value of the fund fell from $205,000 to $106,000 between January 1996 and May 1998, a period during which more suitable and prudent investment of the fund, as mea-

sured by the S&P 500 index, would have increased the fund's value to over $400,000.

## II

The second amended complaint alleges that Franger is liable for defalcations committed by him both as "the financial advisor and account representative for" the fund and as a member of the Board. Advest is alleged to be liable on theories of respondeat superior and failure to supervise Franger. The second amended complaint asserts six causes of action, including breach of Franger's duties as trustee under EPTL 11-2.3 (a); breach of contract by both defendants; fraudulent misrepresentation by Franger; negligence on the part of Franger; negligence on the part of Advest; and the violation of General Business Law § 349 by both defendants. Plaintiffs seek $330,000 in compensatory damages, punitive damages, disgorgement of defendants' gains, and counsel fees.

## III

Just before the scheduled start of trial, defendants moved in limine to preclude plaintiffs "from offering proof of additional profits they claim their account would have earned if it had been invested in alternative securities, the performance of which they claim would have tracked the S&P 500 or other market indices, on the ground that any award of damages based on such proof would be contrary to the law governing plaintiffs' claims." While conceding the existence of federal authority supporting plaintiffs' demand for lost appreciation damages, defendants argued that, under New York law, the only proper and nonspeculative measure of damages is the value of the capital actually lost by plaintiffs, plus interest. For that proposition, defendants cited *Matter of Janes* (90 NY2d 41 [1997], *rearg denied* 90 NY2d 885 [1997]).

Plaintiffs opposed the motion, asserting their right to seek recovery of market index damages and protesting any limitation of their recovery to the difference between the relevant beginning value of the fund ($205,000 in January 1996) and its value when defendants were removed from control over it ($106,000 in May 1998). Plaintiffs sought to distinguish *Janes* and instead cited *Matter of Rothko* (43 NY2d 305 [1977]) in support of their request for such damages.

Supreme Court ordered that "defendants' motion for an order *in limine* precluding plaintiffs from offering proof of additional profits they claim their account would have earned if it

had been invested in alternative securities, the performance of which they claim would have tracked the S&P 500 or other market indices, is hereby granted, and plaintiffs are precluded from offering such evidence at trial based on" *Janes*. Plaintiffs appeal from that part of an order that, upon reargument, adhered to the prior order precluding them from offering proof of market index damages.

## IV

██ We address first the issue of appealability. Defendants cite the oft-repeated propositions that "no appeal lies from an order adjudicating in advance of trial the admissibility of evidence" (*Vesperman v Wormser*, 283 AD2d 637, 638 [2001]; *see Rondout Elec. v Dover Union Free School Dist.*, 304 AD2d 808, 810 [2003]; *Chateau Rive Corp. v Enclave Dev. Assoc.*, 283 AD2d 537 [2001]; *Brennan v Mabey's Moving & Stor.*, 226 AD2d 938 [1996]), and that such an evidentiary ruling, "even when made * * * on motion papers constitutes, at best, an advisory opinion which is neither appealable as of right nor by permission' (*Cotgreave v Public Adm'r of Imperial County*, 91 AD2d 600, 601; *see, Savarese v City of N.Y. Hous. Auth.*, 172 AD2d 506, 509; *Pellegrino v New York City Tr. Auth.*, 141 AD2d 709)" (*Chateau Rive Corp.*, 283 AD2d at 537).

The notion that no appeal as of right lies from an evidentiary ruling, whether made before or during trial, is certainly sound to the extent that the ruling has not been embodied in a formal order (*see* CPLR 5512; *see also* CPLR 5511, 5701). Otherwise, the proposition cannot be squared with the provisions of CPLR articles 55 and 57. CPLR 5512 (a), entitled "Appealable paper," straightforwardly provides that "[a]n initial appeal shall be taken from the judgment or order of the court of original instance * * *." CPLR 5701 (a) (2) (iv) and (v) authorize an appeal as of right from any order (other than the three types specified in subdivision [b]) that "involves some part of the merits" or "affects a substantial right" (*see Rondout Elec.*, 304 AD2d at 811; *Wall St. Assoc. v Brodsky*, 295 AD2d 262, 262-263 [2002]; *MacMillan v Kavanaugh* [appeal No. 1], 267 AD2d 1014 [1999], *lv dismissed* 94 NY2d 943 [2000]; *Brown v State of New York*, 250 AD2d 314, 320-321 [1998]). Further, CPLR 5701 (a) (2) (viii) authorizes an appeal from an order granting a motion for leave to reargue pursuant to CPLR 2221 (d). Nothing in the foregoing provisions circumscribes the right to appeal from an order merely because it is concerned with the admissibility of evidence.

Moreover, we cannot conclude that the order in question "constitutes, at best, an advisory opinion" or merely adjudicates the admissibility of evidence at trial (*Cotgreave,* 91 AD2d at 601), and thus we conclude that the cases cited by defendants are inapposite. As defendants explicitly recognize, there is a distinction between an order that "limits the admissibility of evidence," which is not appealable under the line of cases that they cite, and one that "limits the legal theories of liability to be tried" or the scope of the issues at trial, which is appealable, even according to the line of authority upon which defendants rely (*Strait v Arnot Ogden Med. Ctr.,* 246 AD2d 12, 14 [1998]; *see Ferrara v Kearney,* 285 AD2d 890 [2001]; *Brown,* 250 AD2d at 320-321).

The order in this case is far from advisory. Rather, it has a concretely restrictive effect on the efforts of plaintiffs to prove their case against defendants and recover certain damages from them, just as our reversal of the order would have "the very tangible effect of permitting the plaintiff[s] to seek full recovery of [their] actual damages" (*Rondout Elec.,* 304 AD2d at 811). In addition, the order does not merely limit the production of certain evidence as immaterial to damages, but rather effectively grants defendants partial summary judgment on the critical substantive issue of what constitutes the proper measure of damages on plaintiffs' causes of action. Thus, defendants' motion, although labeled one in limine, actually "was the functional equivalent of a motion for partial summary judgment dismissing the complaint insofar as it sought damages * * * in excess of the damages" that defendants believe are appropriate (*id.* at 810). That is not to say that a motion in limine is an appropriate substitute for a motion for partial summary judgment; it is not (*see id.* at 810-811; *see also Rivera v City of New York,* 306 AD2d 456 [2003]; *Marshall v 130 N. Bedford Rd. Mount Kisco Corp.,* 277 AD2d 432 [2000], *lv denied* 96 NY2d 714 [2001]; *Downtown Art Co. v Zimmerman,* 232 AD2d 270 [1996]). In any event, where, as here,

> "a party misuses a motion in limine as the procedural equivalent of a motion for partial summary judgment, and the court decides that motion, resulting in an order that limits the issues to be tried, that order is appealable. An order deciding such a motion clearly involves the merits of the controversy (*see* CPLR 5701 [a] [2] [iv]) and affects a substantial right (CPLR 5701 [a] [2] [v]) and thus is appealable (*see Marshall * * *,* 277 AD2d 432

[2000]; *see also Campaign for Fiscal Equity v State of New York,* 271 AD2d 379 [2000]; *Qian v Dugan,* 256 AD2d 782 [1998])" (*Rondout Elec.,* 304 AD2d at 811; *see also Wall St. Assoc.,* 295 AD2d at 262-263; *MacMillan,* 267 AD2d 1014; *Brown,* 250 AD2d at 320-321).

## V

Concerning the substantive issue, plaintiffs contend that an award of lost profit or lost appreciation damages, including those based on a market index, is proper in a case alleging the unauthorized, unsuitable trading and the churning of the investment fund by the broker/trustee and his firm. The issue is whether plaintiffs' loss (exclusive of interest) is properly measured merely against the value of the fund in January 1996, or also against the market's general performance over the period in question, i.e., taking into account that Franger's management of the fund resulted in a drastic and improbable diminution in its value over a period during which the overall market was appreciating markedly.

At the outset, we note that the second amended complaint is not limited to a cause of action for breach of fiduciary duty, but also includes causes of action for negligence, breach of contract, fraud, and the violation of General Business Law § 349. While the precise measure of damages may vary under each of those theories, there can be no doubt that, under all of them, the "object of compensatory damages" is the same, i.e., to make the plaintiff "whole" (*Campagnola v Mulholland, Minion & Roe,* 76 NY2d 38, 42 [1990]; *see Sharapata v Town of Islip,* 56 NY2d 332, 335 [1982]; *Rothko,* 43 NY2d at 322; *see also Love v State of New York,* 78 NY2d 540, 544 [1991]). In a tort case, "[c]ompensatory damages, whether general or special, serve to make good, so far as it is possible to do so in dollars and cents, the harm done by a wrongdoer" (36 NY Jur 2d, Damages § 10, citing *Sanders v Rolnick,* 188 Misc 627, 631 [1947], *affd* 272 App Div 803 [1947]), whereas in a contract case they serve to " '*put [the plaintiff] in as good a position as he would have occupied had the contract been kept.*' (11 Williston, Contracts [3d ed.], § 1395A, p. 484 * * *)" (*Menzel v List,* 24 NY2d 91, 97 [1969] [emphasis in original]; *see generally Kenford Co. v County of Erie,* 73 NY2d 312, 319 [1989]). "Put another way, [compensatory damages] measure 'fair and just compensation, commensurate with the loss or injury sustained from the wrongful act' (13 NY Jur, Damages, § 9; see McCormick, Dam-

ages, §§ 20, 137; James, Damages in Accident Cases, 41 Cornell LQ 582)" (*Sharapata,* 56 NY2d at 335).

Even if plaintiffs alleged only a breach of fiduciary duty, the proper measure of damages would depend on the precise nature of the wrong or wrongs committed by defendants. As identified by the parties, the landmark decisions on this issue are those of the Court of Appeals in *Rothko* (43 NY2d 305) and *Janes* (90 NY2d 41), the latter of which affirmed a decision of this Court (223 AD2d 20 [1996]).

*Rothko* was a proceeding involving the estate of Mark Rothko, the abstract expressionist painter. The principal asset of the estate consisted of 798 paintings of considerable value, and the petition sought damages for the conduct of the three executors in consigning those paintings to art dealers for resale at inadequate prices and for excessive commissions, transactions in which two of the executors had a self-interest. Such conduct was "portrayed in the record and sketched in the opinions [as] manifestly wrongful and indeed shocking" (*Rothko,* 43 NY2d at 314). Following a trial, the executors were found to have violated their fiduciary duties to the estate (*see id.* at 315-320). The Surrogate held that the proper measure of damages against the consignees and the two self-interested executors was the value of the paintings at the time of trial (*see id.* at 316).

On appeal, the propriety of such lost appreciation or lost profit damages was an issue that divided the Appellate Division (*see id.* at 317-318, 320). However, a unanimous Court of Appeals rejected the contention that the award of such damages was legally erroneous and impermissible, contrasting the case before it from those in which the " 'breach of trust consisted *merely* in selling the property for too low a price' " (*id.* at 320). The Court wrote:

> " 'If the trustee is guilty of a breach of trust in selling trust property for an inadequate price, he is liable for the difference between the amount he should have received and the amount which he did receive. He is not liable, however, for any subsequent rise in value of the property sold' " (*id.* at 320-321).

The Court further wrote, however,

> "that where the breach consists of some misfeasance, other than solely for selling 'for too low a price' or 'for too little', appreciation damages may

be appropriate. * * * [T]he trustee may be held liable for appreciation damages if it was his or her duty to retain the property, the theory being that the beneficiaries are entitled to be placed in the same position they would have been in had the breach not consisted of a sale of property that should have been retained. The same rule should apply where the breach of trust consists of a serious conflict of interest—which is more than merely selling for too little. * * *

"Here, the executors, though authorized to sell, did not merely err in the amount they accepted but sold to one with whom [they] had a self-interest. * * * [S]ince the paintings cannot be returned, the estate is therefore entitled to their value at the time of the decree, i.e., appreciation damages. These are * * * damages intended to make the estate whole. Of course, as to [the executors and consignees], these damages might be considered by some to be exemplary * * * in that they serve as a warning to others * * *, but their true character is ascertained when viewed in the light of overriding policy considerations and in the realization that the sale and consignment were not merely sales below value but inherently wrongful transfers which should allow the owner to be made whole" (*id.* at 321-322).

Although noting the impossibility of appraising the current value of the unreturned works of art with absolute certainty, the Court of Appeals stated:

"[S]o long as the figure arrived at had a reasonable basis of computation and was not merely speculative, possible or imaginary, the Surrogate had the right to resort to reasonable conjectures and probable estimates and to make the best approximation possible through the exercise of good judgment and common sense in arriving at that amount * * *. This is particularly so where the conduct of wrongdoers has rendered it difficult to ascertain the damages suffered with the precision otherwise possible" (*id.* at 323).

In contrast to *Rothko*, *Janes* was a case in which the fiduciary merely wrongfully failed to diversify the portfolio, instead

retaining upwards of 70% of the estate's assets in Eastman Kodak Company (Kodak) stock while the value of such shares dropped precipitously over a period of years. On account of the fiduciary's imprudent management of the portfolio, the Surrogate awarded lost appreciation damages of over $6 million based on the $1.6 million value of the Kodak stock on the date by which the fiduciary, in the exercise of due care, should have sold most of the stock, multiplied by the cumulative rate of return subsequently achieved on a well-diversified stock fund otherwise managed by the fiduciary, reduced by the dividends on and ultimate proceeds of the sale of the stock (*see Matter of Janes,* 165 Misc 2d 743 [1995]). On appeal to our Court, we deemed that damages calculation to be "error," stating:

> "The proper measure of damages for a fiduciary's negligent retention of assets is the value of the capital that was lost * * *[, which is] calculated by determining the value of the securities at the time they should have been sold, minus their value when ultimately sold or, if they are still retained by the estate, their value at the time of the accounting or the court's decision * * *. The court should subtract amounts received by the estate as dividends or other income attributable to the retained assets" (*Janes,* 223 AD2d at 34).

We noted the line of cases rejecting, as "the proper measure of damages for improper retention of securities, * * * a measure of damages based upon lost profits or appreciation" and one "based upon the hypothetical performance of an investment of the proceeds of sale in the market" (*Janes,* 223 AD2d at 35). We further noted that the Court of Appeals had "impliedly endorsed the reasoning of those cases" in *Rothko* (*Janes,* 223 AD2d at 34). However, distinguishing *Rothko,* we held:

> "Here, the fiduciary imprudently retained unproductive assets, as opposed to unlawfully selling productive assets, and there is therefore no basis for awarding damages based on lost appreciation" (*Janes,* 223 AD2d at 36).

On appeal, the Court of Appeals upheld our rejection of the Surrogate's measure of damages based upon a market index, stating:

> "Where, as here, a fiduciary's imprudence consists solely of negligent retention of assets it should have sold, the measure of damages is the value of the

lost capital * * *. Thus, the Surrogate's reliance on *Matter of Rothko* in imposing a 'lost profit' measure of damages is inapposite, since in that case the fiduciary's misconduct consisted of deliberate self-dealing and faithless transfers of trust property (43 NY2d, at 321-322, *supra*)" (*Janes,* 90 NY2d at 55).

## VI

Many federal decisions, including some that address pendent state common-law causes of action as well as causes of action arising under federal securities law, support the award of lost appreciation (or excess depreciation)* damages for the mismanagement of an investment portfolio, provided that there has been a breach of trust extending beyond mere negligence and committed for the personal gain of the fiduciary. Like this case, such cases involve allegations of excessive and unsuitable trading. Foremost among those cases is *Rolf v Blyth, Eastman Dillon & Co., Inc.* (570 F2d 38 [1978], *amended* 1978 WL 4098 [2d Cir 1978], *cert denied* 439 US 1039 [1978]), a Second Circuit decision. The complaint in *Rolf* alleged, inter alia, the fiduciary's abetting of a cofiduciary's overtrading and inappropriate investment of the plaintiff's portfolio. With regard to the proper measure of damages, *Rolf* holds:

"First, the district court should determine as near as possible the time when [the fiduciary] began to aid and abet [the cofiduciary's] fraud and compute the market value of [the plaintiff's] portfolio on that date. Second, the district court should subtract the value of the portfolio on the date when [the fiduciary's] participation in and assistance to the fraudulent scheme ceased from the value on the date when [the fiduciary] became an aider and abettor. This amount is [the plaintiff's] gross economic loss. * * * The district court should then reduce [the plaintiff's] gross economic loss by the average percentage decline in value of the Dow Jones Industrials, the Standard & Poor's Index, or any other well recognized index of value, or combination of indices, of the national securities markets during the period commencing with [the fiduciary's] aiding and abetting and terminating with its cessation. * * *

* The principal federal decisions, unlike this case, involve defalcations committed during a bear market.

> We also hold that [the plaintiff] is entitled to a return of commissions paid to [the fiduciary] and [the fiduciary's employer], but only as to transactions falling within the aiding and abetting period, with interest thereon as determined by the district judge" (*id.* at 49-50 [citations omitted]).

In an accompanying footnote, the court discussed which market index might be utilized:

> "If the district judge should determine that, when the aiding and abetting period began, the quality of stocks in the portfolio was such that a broad-based index would not be representative of those stocks, then he may select a more appropriate gauge, perhaps a portion of an index, perhaps a composite of indices, perhaps expert opinion" (*id.* at 49 n 22).

Similarly, in *Miley v Oppenheimer & Co., Inc.* (637 F2d 318 [1981], *reh denied* 642 F2d 1210 [1981]), another case involving allegations of churning and unsuitable investments, the Fifth Circuit permitted the plaintiff to recover both for the commissions and interest paid as a result of the excessive trading and for the decline in the value of her account in excess of the average decline in the stock market over the period of the defendant broker's management of the account. Rejecting the argument that there had been a double recovery, the court observed:

> "[T]here are in fact two distinct harms which may be proximately caused by the broker's churning of an account. It is necessary to remedy both harms in order to fully compensate the victimized investor.

> "First, and perhaps foremost, the investor is harmed by having had to pay the excessive commissions to the broker[,] the 'skimmed milk' of the churning violation.* * * [Such harm occurs] regardless of whether the investor's portfolio increased or decreased in value as a result of such trading. Second, the investor is harmed by the decline in the value of his portfolio[,] the 'spilt milk' of the churning violation[,] as a result of the broker's having intentionally and deceptively concluded transactions, aimed at generating fees, which were unsuitable for the investor. * * * [Such harm occurs] regardless of the amount of the commissions paid to the broker. In sum, once a jury

finds that the broker has churned an investor's account, it may also find that the investor would have paid less commissions and that his portfolio would have had a greater value had the broker not committed the churning violation" (*id.* at 326).

The court further observed that a victim of churning may be damaged by having to pay the brokerage commissions on both purchases and sales, by missing dividends, by incurring unnecessary capital gains or income taxes "and, most difficult to measure, [by losing] the benefits that a well-managed portfolio in long-term holdings might have brought him" (*id.*).

The *Miley* court then addressed whether damages should be measured by a market index. The court noted the "difficulty in accurately measuring the loss in portfolio value proximately caused by the excessive trading and unsuitable transactions," as well as the impossibility of computing "the exact amount of trading losses caused by the churning of an account" (*id.* at 327). The court nevertheless held the plaintiff to be "entitled to recover the difference between what he would have had if the account ha[d] been handled legitimately and what he in fact had at the time the violation ended" (*id.*). The court stated:

"In order to approximate the trading losses caused by the broker's misconduct, it is necessary to estimate how the investor's portfolio would have fared in the absence of * * * such misconduct. The trial judge must be afforded significant discretion to choose the indicia by which such estimation is to be made, based primarily on the types of securities comprising the portfolio. However, in the absence of either a specialized portfolio or a showing by either party that a different method is more accurate, it seems that the technique discussed * * * in *Rolf* * * * and employed by [the District Court] in this case is preferable. * * * This mode of estimation utilizes the average percentage performance in the value of the Dow Jones Industrials or the Standard and Poor's Index during the relevant period as the indicia of how a given portfolio would have performed in the absence of the broker's misconduct" (*id.* at 328 [citations omitted]).

The court upheld a charge requiring the jury to compute the damages sustained by plaintiff by ascertaining the amount of her original investment and subsequent dividends thereon, subtracting therefrom any withdrawals received by her and

the ending value of her account with the broker, and further subtracting "the average percentage decline in value of the Dow Jones Industrials or the Standard and Poor's Index during the relevant period of time" (*id.*).

## VII

Based on the foregoing, we hold that in a case such as this, involving claims of churning, investment unsuitability, or other acts of unauthorized trading by defendants, an appropriate measure of damages is plaintiffs' "gross economic loss, adjusted for the overall market's performance" (*In re Drexel Burnham Lambert Group, Inc.,* 161 BR 902, 909 [1993], citing *Rolf,* 570 F2d at 49; *see Miley,* 637 F2d at 326-328; *In re Thomson McKinnon Sec., Inc.,* 191 BR 976, 987-988 [1996]; *see also Kronfeld v Advest, Inc.,* 675 F Supp 1449, 1456 [1987]; *see generally Davis v Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 906 F2d 1206, 1217-1218 [1990]; *McGinn v Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 736 F2d 1254, 1257 [1984]; *Brabham v A.G. Edwards & Sons, Inc.,* 265 F Supp 2d 720, 725 [2003]; *Laney v American Equity Inv. Life Ins. Co.,* 243 F Supp 2d 1347, 1353-1356 [2003]; *Medical Assoc. of Hamburg, P.C. v Advest, Inc.,* 1989 WL 75142,*2 [WD NY, July 5, 1989]; *Winer v Patterson,* 644 F Supp 898, 900-901 [1986], *vacated in part on other grounds* 663 F Supp 723 [1987]; *Lopez v Dean Witter Reynolds, Inc.,* 591 F Supp 581, 589-590 [1984]). We thus conclude that the court erred in foreclosing plaintiffs as a matter of law from recovering market index or other like lost appreciation damages (*see Rothko,* 43 NY2d at 320-322). Plaintiffs are not necessarily limited to recovering the value of their lost capital, and might well recover compensatory damages calculated in part on the basis of general market performance. Plaintiffs have alleged a necessary predicate for such recovery, namely, a breach of fiduciary duty extending beyond mere negligent retention of the portfolio's holdings and violation of a duty to sell or diversify (*see Janes,* 90 NY2d at 55, citing *Rothko,* 43 NY2d at 321-322). Indeed, plaintiffs have alleged deliberate and flagrant self-dealing and dishonesty on the part of defendants, namely, their unauthorized trading of the fund and speculative and otherwise unsuitable investment decisions with regard to it, transactions allegedly engaged in for defendants' own benefit. To employ the metaphor used in *Miley* (637 F2d at 326), the "spilt milk" of defendants' alleged overtrading and inappropriate investment of the fund may include both plaintiffs' lost capital and plaintiffs' lost opportunity to realize generalized market appreciation or gain.

Accordingly, the order insofar as appealed from should be reversed and defendants' motion denied.

PIGOTT, JR., P.J., PINE and WISNER, JJ., concur.

It is hereby ordered that the order insofar as appealed from be and the same is unanimously reversed, on the law, with costs, and defendants' motion is denied.